703 So.2d 527 (1997)
Rayna MYRON, a minor, By and Through her parents and natural guardians, Sharon BROCK, Herbert B. Myron, and Sharon Brock and Herbert B. Myron, individually, Appellants/Cross-Appellees,
v.
SOUTH BROWARD HOSPITAL DISTRICT, d/b/a Memorial Hospital, etc., et al., Appellees/Cross-Appellants.
No. 94-2287.
District Court of Appeal of Florida, Fourth District.
December 31, 1997.
*528 Scott M. Newmark of Sheldon J. Schlesinger, P.A., Fort Lauderdale, for appellants/cross-appellees.
Gary M. Farmer, Jr. and Nancy W. Gregoire of Bunnell, Woulfe, Keller & Gillespie, P.A., Fort Lauderdale, for appellee/cross-appellant.
WARNER, Judge.
This medical malpractice action began in 1988 and, as to appellee, South Broward Hospital District, d/b/a Memorial Hospital, ended with a directed verdict in its favor at trial in 1994. The appellants claim that the trial court erred in refusing to admit the testimony of their expert as to the negligence of a physician employed by appellee in the treatment of the injured minor appellant. Without that testimony, there was no other opinion as to the medical negligence of the appellee or its employees. The trial court granted a motion to exclude the testimony based on a "stipulation" of the parties at the deposition of the expert. As we do not agree that the deposition statements were a "stipulation," we hold that the court erred in refusing to admit the testimony of the expert. We therefore reverse.
In September of 1987, Sharon Brock, the mother of six-month old Rayna, brought the baby to the emergency room of Doctor's Hospital because she had a fever. The doctors there diagnosed the baby as having otitis media (ear infection), prescribed some medication, and sent them home. The next day, the baby was seen by her regular pediatric group, and the doctor determined that the baby did not have an ear infection and discontinued the medication. As a precaution, another pediatrician in the group saw the baby the next day to confirm her condition, which appeared to be improving at the time. Three days later, the screaming mother rushed into the emergency room of Humana Hospital Bennett with the baby in her arms crying that her baby couldn't breathe. A code blue was called, resuscitation efforts commenced, and a pediatrician was called. Suspecting meningitis, the pediatrician ordered an I.V. of antibiotics, which was considered the standard treatment for meningitis. After about three hours of resuscitation and treatment efforts at the hospital, Dr. Yvonne Rutherford, a pediatric intensivist who was called to treat the baby, ordered her transfer to Plantation Hospital where the intensivist was on staff.
At Plantation Hospital, CT scans of the baby were taken, and, according to the testimony of the physicians involved, they revealed an acute subdural hematoma in the brain. There is significant controversy as to whether this was a hematoma or a subdural effusion, but in any event the scans showed damage to the brain. Dr. Rutherford also observed a retinal hemorrhage upon an ophthalmoscopic examination. Because Dr. Rutherford felt a neurological opinion as to the baby's condition was necessary, she transferred her to Memorial Hospital later that same evening.
When the baby and her CT scans arrived at Memorial Hospital, Dr. Rutherford conferred with the hospital's neurosurgeon, Dr. Giulianti, regarding the mass in the brain. At that time, they diagnosed the cause of these injuries as shaken baby syndrome.
According to a CT scan taken the next day, the brain had swollen much more. Mannitol was administered to reduce the swelling, but Rayna had suffered significant and irreversible brain damage, causing severe impairments to the child and resulting in spastic quadriplegia.
There were diametrically opposed explanations for the cause of the injuries to Rayna. The appellants contended that the baby suffered from a missed diagnosis of meningitis, which was treated by the antibiotics prescribed at Doctor's Hospital. This resulted *529 in partially treated meningitis which finally erupted into fulminating meningitis and caused respiratory arrest in the baby. When doctors at Bennett attempted resuscitation, they failed, through their negligence, to resuscitate the baby properly, causing the subsequent brain injury.
The eight doctors and three hospitals that were sued all maintained that the baby did not have meningitis and was injured through child abuse  shaken baby syndrome. They claimed that all of her injuries were a direct result of the abuse, and their experts testified that all of the care rendered to the baby was within the relevant standards of care.
Although there were several allegations of negligence against Dr. Guilianti and Memorial Hospital in the 293 page complaint, at trial, the appellants offered only the testimony of Dr. Philip Calcagno, a pediatrician, as to Dr. Guilianti's negligence. Dr. Calcagno was prepared to testify that Dr. Giulianti was negligent in failing to perform a spinal tap on the baby when she was admitted to Memorial Hospital and that that contributed to her injuries. Memorial's attorney objected to the admission of such testimony, citing to the court the deposition of Dr. Calcagno in August of 1993, some ten months earlier.
At the deposition, after an off-the-record discussion, the appellants' attorney announced on the record that he would not offer Dr. Calcagno as a witness against Memorial and several of the other hospitals and defendants. However, when Memorial's lawyer persisted in questioning Dr. Calcagno regarding his opinions, appellants' lawyer told her on the record that he would now offer Dr. Calcagno as a witness against the Memorial doctors, to which Memorial's attorney responded "[t]hank you." At the end of the deposition, appellants' attorney asked Dr. Calcagno whether Memorial deviated from the standard of care in failing to perform a spinal tap, and he opined that they had so deviated.
Appellants' Notice of Compliance to a court order requiring appellant to list all of its experts and their specialties was also presented to the trial court on motion for directed verdict. The Notice of Compliance listed Dr. Calcagno as a pediatrics expert and two other doctors as experts in neurosurgery. However, this list was filed prior to Dr. Calcagno's deposition and the appellants subsequently withdrew the experts in neurosurgery. Therefore, the only expert who the appellants had to testify as to any deviation from the standard of care by Memorial was Dr. Calcagno.
The trial court reviewed the deposition and notice and determined that the parties entered into a stipulation entered into at the deposition, which prevented Dr. Calcagno from offering opinions as to Dr. Guilianti. Thus, the court excluded the only expert testimony the appellants had to support the case against Memorial.
In Binger v. King Pest Control, 401 So.2d 1310 (Fla.1981), the supreme court determined that a trial court could properly exclude testimony of a witness who was not disclosed pursuant to a pretrial order but that the primary consideration should be whether the use of the witness would prejudice the objecting party.
Prejudice in this sense refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: (i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case....
Id. at 1314. Applying these criteria to the instant case, we can easily see that there was no prejudice to the opposing party. Memorial not only independently knew of the witness, but also knew the substance of his expected testimony. Its attorney was specifically put on notice that appellant intended to use his opinions at trial against Memorial. At trial, Memorial had listed its own experts whose testimony could have been used to combat Dr. Calcagno's opinions. There was no prejudice. Further, where the effect was to exclude the sole witness against the hospital, we would think that only under the most *530 compelling circumstances should appellants' case be undercut by excluding its only expert witness.
We do not think that the "stipulation" required the exclusion of this testimony. The representation on the record that Dr. Calcagno would not be offered against the hospital was preceded by an off-the-record discussion which, we can only surmise from the tenor of the deposition, was made so that all of the defense attorneys would not have to cross-examine the witness. This is apparent from what transpired after appellants' attorney announced that he would call Dr. Calcagno as a witness against Memorial. The defense attorney representing Dr. Brown asked to take a break, and a discussion was held off the record. Then, on the record, Dr. Brown's attorney stated "[s]o the stipulation is still good with respect to Dr. Brown? ... If you believe that any part of the subsequent proceeding here is going to involve Dr. Brown, then I will hang on." Appellants' attorney assured Dr. Brown's attorney that no opinions would be offered against Dr. Brown, and the attorney said "[w]ith that in mind, as long as you can assure me that the stipulation still holds, I will just bow out at this point." What's more, Memorial's attorney had another on-the-record discussion with appellants' attorney sorting out why she had gone ahead and questioned the doctor. She then said to appellants' attorney, "I'm basically done. Should I question him on Memorial?" Appellants' attorney stated, "Yes you should." Memorial's attorney then addressed the doctor's opinions regarding the standard of care of Memorial doctors and their failure to do a spinal tap on the baby.
In sum, a review of the deposition reveals that there was no "stipulation." There was a representation that the doctor would not be offered as an expert witness against various parties. This apparently was done to relieve various defense attorneys of the necessity of questioning the doctor, thereby shortening the deposition. With respect to Memorial, its attorney chose to question, and the offer was withdrawn. The doctor's testimony should have been admitted at trial.
Appellee also maintains that Dr. Calcagno, a pediatrician, was not qualified to give an opinion as to the negligence, if any, of Dr. Guilianti, a neurosurgeon. We reject this contention. The trial court never made a finding that Dr. Calcagno was not qualified. The evidence on this issue shows that Dr. Calcagno was well qualified to offer an opinion on the necessity to perform a spinal tap, even by a neurosurgeon. See § 766.102(2)(c), Fla. Stat, Wright v. Schulte, 441 So.2d 660 (Fla. 2d DCA 1983), rev. denied, 450 So.2d 488 (Fla.1984).
Finally, appellee contends that Dr. Calcagno's opinions were legally insufficient to provide the necessary elements of the appellants' medical malpractice action against Dr. Guilianti and Memorial Hospital. Dr. Calcagno's proffered testimony as to Memorial Hospital consisted of his opinion that Dr. Giulianti deviated from the acceptable standard of care in failing to perform a spinal tap on Rayna and that this caused or substantially contributed to causing further brain damage to the child. In and of itself, these two statements cover the essential elements of the case. After the proffer of these opinions, appellee's attorney declined the opportunity to cross-examine the doctor or to conduct a voir dire as to the validity of his opinions. Under section 90.705, Florida Statutes (1993), an expert may testify in the form of an opinion without disclosing the underlying facts on which the opinion is based. However, prior to giving the opinion, the party against whom the opinion is offered may conduct an examination of the witness directed to the underlying facts upon which the opinion is predicated. Thus, the burden of challenging the sufficiency of the opinion is placed on the party against whom it is offered. See City of Hialeah v. Weatherford, 466 So.2d 1127 (Fla. 3d DCA 1985). The appellee did not test Dr. Calcagno's opinion, and the opinion is legally sufficient to prove the elements of the appellants' cause of action against Dr. Guilianti and Memorial.
To be sure, there is a significant amount of evidence which shows that any actions of Dr. Guilianti were not the proximate cause of the injuries to the baby. At trial, Dr. Rutherford, the pediatric intensivist, testified that she transferred the baby to Memorial Hospital for a neurosurgical consultation and possible *531 removal of the effusion, as described in her notes. The baby was Dr. Rutherford's patient, and Dr. Guilianti was there only to consult and perform surgery, if necessary. Although a spinal tap was required to obtain a definitive diagnosis of meningitis, which was one of the possible diagnoses by Dr. Rutherford, one was not performed because of intracranial pressure on the baby's brain. A ventricular tap could be performed, but only by a neurosurgeon. Dr. Rutherford testified that she and Dr. Guilianti discussed the possibility of meningitis and she testified that while she did not recall what specific tests were discussed, "the end result was it was Dr. Guilianti's decision as to what invasive work he would do on the child's brain." Moreover, they both concluded that the injury was a result of trauma, not meningitis. Nevertheless, Dr. Rutherford continued the antibiotics begun at Humana Bennett to treat for possible meningitis and also changed them at Memorial to a different drug, also a drug of choice for meningitis. There was no criticism of the drug regimen that Dr. Rutherford applied to the baby and there was no suggestion that the regimen was insufficient to treat any meningitis present in the baby's system.
In his testimony at trial as to the negligence of some of the other health care providers, Dr. Calcagno opined that Dr. Rutherford fell below the standard of care in failing to perform a spinal tap on the baby when she arrived at Memorial and that this failure continued the process of damaging the baby's brain. His concern was that without the tap, there was no information about the causative agent of brain damage, noting that bacteria do change their ways of attacking the body, even with antibiotics present. However, he never testified as to how treatment would change with such information in hand. Moreover, he agreed that the drugs actually administered to the baby were appropriate to treat meningitis. Finally, he was asked whether irreversible brain damage was complete upon admission to Plantation Hospital, the hospital the baby was transferred to prior to Memorial. He agreed that the brain damage was irreversible but he questioned whether or not it was complete. Specifically, he questioned the extent to which the subdural hematomas and "loculations of fluid" might have continued the process of damage. Thus, he said "I would use the word irreversible, but maybe not complete. I would take that as a question mark." (emphasis added).
In addition to the testimony of Dr. Calcagno, multiple other experts testified in the appellants' case. Dr. Martin Raff, an infectious disease expert, testified that it was irrelevant that a spinal tap was not performed at Plantation or Memorial. He concluded that there reached a point in the baby's care that "because of the severe neurologic damage that had occurred and the evidence on the CT scans, a lumbar puncture might have been contraindicated because the child had already [been] treated." Dr. David Robinson, another highly reputable pediatrician, offered no opinions about Memorial but testified that the baby's brain damage occurred at Humana Bennett as a result of failed resuscitative efforts. Dr. Tourje, a neuroradiologist, also held no opinion as to any negligence at Memorial Hospital. Dr. Schenk, a neurologist, testified that by the time the child was transferred to Memorial Hospital, there was nothing that could have been done for the child which would have changed her outcome significantly.
All of this evidence casts considerable doubt on Dr. Calcagno's abbreviated opinions as to Dr. Guilianti's negligence. However, a jury is the judge of the credibility of the witnesses and the evidence, and a jury is free to believe parts of a witness' testimony and disbelieve other parts. See Marks v. Delcastillo, 386 So.2d 1259, 1266 (Fla. 3d DCA 1980); Wynne v. Adside, 163 So.2d 760, 763 (Fla. 1st DCA 1964). The believability of Dr. Calcagno and the credibility of his opinions as to negligence were for the jury to decide.
The appellants' final claim regards the direction of a verdict in favor of Memorial Hospital on the issue of apparent agency between Dr. Rutherford and the hospital. We agree with the appellee that the allegations were insufficient to send this issue to the jury. Moreover, there was no evidence presented at trial which would indicate that the issue was tried by implied consent. In fact, the evidence that was adduced showed *532 that the appellants believed that Dr. Rutherford was an employee of Plantation General Hospital, not Memorial. On this point we therefore affirm.
Affirmed in part; reversed in part, and remanded for a new trial.
STONE, C.J., and STEVENSON, J., concur.