731 So.2d 118 (1999)
Donald C. MEYER, as Personal Representative of the Estate of Ann Meyer, deceased, Appellant,
v.
Phillip A. CARUSO, M.D., Appellee.
No. 98-0619.
District Court of Appeal of Florida, Fourth District.
April 21, 1999.
*119 John L. Walkden of the Law Offices of John L. Walkden, Fort Lauderdale, for appellant.
Gina E. Caruso of Hinshaw & Culbertson, Fort Lauderdale, for appellee.
FARMER, J.
During trial in this medical malpractice action, the judge struck the entire testimony of plaintiff's only expert witness on the standard of care and then directed a verdict in favor of defendant. Because we conclude that the basis for striking the testimony was legal error, we reverse.
Plaintiff's decedent suffered from cervical cancer in 1989 and underwent surgery by defendant, who appears to be a gynecology-oncology surgeon, to remove the affected organs. Afterwards she was given radiation treatment and continued in follow-up care by defendant. He ordered regular PAP smears in the years following 1989 but did not order any CT scans. In July 1994 she suffered a recurrence of her cancer, this time in her pelvis and abdominal wall. She passed away several months later.
In July 1996, her estate sued defendant for medical malpractice, alleging that he departed from the standard of care in failing during her follow-up care to order any CT scans and other diagnostic procedures, and that earlier diagnosis from such procedures in all probability would have saved her life. Plaintiff disclosed Dr. Barry Singer as the standard-of-care, medical expert. Attached to his notice was an affidavit executed by Dr. Singer in February 1996, which stated that after reviewing a listing of designated medical records of the patient he had formed an opinion that defendant had deviated from the standard of care and that this deviation proximately caused decedent's death. A pretrial stipulation was then filed by counsel with attached witness lists.[1] Trial began during the scheduled period, and Dr. Singer was called by plaintiff as the medical, standard-of-care expert.[2]
He testified that he took his undergraduate degree at Harvard and his medical degree at Johns Hopkins. He completed an internship and residency in internal medicine, followed by a fellowship in hematology and oncology, at the Graduate Hospital of the University of Pennsylvania. He is Board Certified in Internal Medicine, Hematology, and Oncology. He was the Chairman of the Oncology Division of Sacred Heart Hospital in Pennsylvania for 15 years. He specifically testified that he is currently a practicing physician:
"My practice is mainly a consultative practice. Seventy percent of my patients are cancer patients; the remainder are hematology and internal medicine *120 patients. They are generally seen regarding possible chemotherapy or many of them followjust as follows [sic]regarding treatment of this disease."
Defendant developed on cross examination a decided emphasis by Dr. Singer in employment on behalf of plaintiffs in medical negligence cases. Dr. Singer stated that he had reviewed more than 700 medical negligence cases, had given depositions in more than 200 cases, and had been qualified to testify as a medical expert in 30 statesseveral times in Florida. He conceded that about 95% of his forensic medicine was on behalf of plaintiffs.
He agreed with defense counsel's observation that "a careful and prudent physician expert like [himself] would want to see medical records first before drawing any opinions or conclusions about the care." As regards this case, he testified that records were sent to him and that he reviewed such records before he reached an opinion, stating flatly that he never gives an opinion without the records. He was confronted with a letter to him from plaintiffs counsel, however, that (omitting formalities) said:
"Thank you for taking your time to talk to me regarding your thoughts and impressions of the follow-up treatment of [decedent] after her cancer surgery by Doctor Phillip Caruso. I agree with you that he was probably a breach of the standard of care in that there appear to have been no additional follow-up test other than PAP smears, and this at the very least more likely than not reduced her chances of survival, or led to her untimely death.
"I am having the medical records of [decedent] shipped to you under separate cover. After you have had a chance to review them, and presuming your thoughts and impressions have not changed, I would appreciate your sending me a sworn statement as required by Florida Statutes as to whether or not there was a breach of the standard of care, and if so, why, and further whether that breach was the proximate cause of either [decedent's] untimely death, or more likely than not decreased her chances of survival." [emphasis supplied.]
The following cross examination then ensued:
Q. You hadn't reviewed any medical records when you reached that opinion, did you sir?"
A. I had to review records, sir.
Q. Show me where you have the correspondence sending you the records of 1996?
A. The records were sent to me. I never give an opinion without the records.
Q. Then why would [plaintiffs counsel] in his letter to you indicate that he was sending you records under separate cover?
A. He may have been sending me other records and after his deposition of [defendant] I was sent another set of records because [plaintiffs counsel] didn't have the complete set of records until [defendant's] deposition. I guess they were some patient witnesses.
Later he added: "It's a custom to review the records prior to my opinion. That's all I can say."
Turning to the subject of "similar medical specialty,"[3] Dr. Singer admitted that he had never been board certified in any area of surgery or obstetrics. No court has ever accepted him as an expert in *121 gynecology, obstetrics or gynecologic oncology. He admitted to never having any continuing education in gynecology. He conceded that he does not perform radical hysterectomies or, for that matter, surgery of any kind. He does not practice in follow up gynecological care. He does not initially diagnose cervical cancer. He has not published in the field of cervical cancer. Nor does he consider himself an expert in gynecological oncology because he is not board certified in that specific area. He would not see surgical patients who have not yet developed metastatic disease. He himself would not follow up a gynecological surgery patient through radiation.
On the other hand, he unequivocally testified that he is familiar with the standards for follow up, oncological care of cancer patients who have undergone radical hysterectomies and radiation treatment. While he does not do pelvic exams, he does know what these oncology patients require in such follow up care. He emphasized that he was the Chairman of the Tumor Board at the hospital for 15 years and thus dealt with all kinds of cancers.[4]
At the close of the testimony of Dr. Singer, defendant moved to strike his entire testimony and for a directed verdict. Defendant argued that Dr. Singer did not satisfy the requirements of section 766.102 because "he does not treat these cases, does not follow these patients, does not have any contact with them from the time of surgery until the time of recurrence."[5] In short the argument was that Dr. Singer does not "in any way possess the training, experience or skill as defined by the statute to enable him to offer an opinion on the standard of care on this issue." Elaborating later, defense counsel argued that Dr. Singer was not a qualified health care professional under section 766.102, in that he lacked familiarity with regard to follow up examinations, studies and CT scans for post cervical cancer surgical patients, that he is not a surgeon or board certified in surgery or gynecology.
In granting defendant's motion to strike and for directed verdict, the trial judge expressly cited Florida Evidence Code sections 90.702 and 90.704,[6] as well as Vallot v. Central Gulf Lines, Inc., 641 F.2d 347 (5th Cir.1981). Further explaining, he said:
"I can't envision an oncologist or any other doctor that's in a field of medicine rendering a prognosis for a course of treatment or a diagnosis first based upon the testimony of his attorney. I therefore strike Singer, find him to be a professional witness; how [sic] under 90.702 and 704, opinion was based solely upon the conversations with his counsel and then later those particular opinions were fortified and supported by the medical records he received."
Plaintiff later moved for a new trial supported in part by an affidavit from Dr. Singer. In an order denying plaintiff's motion the judge further explained:
"During the trial, the Court exercised its broad discretion by excluding Dr. Singer's expert testimony, after specifically finding that Dr. Singer's opinion has been `based solely upon the conversations with his counsel and then later those particular opinions were fortified and supported by the medical records he received. Further legal research on the matter uncovered a plethora of problems attached to Dr. Singer's testimony in other states besides Florida.[7]

*122 . . .
"As a matter of law, experts are allowed to testify if their `scientific, technical or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue....' Fla. Stat. § 90.702 (1985). In the case at bar, the Court concludes that the material discrepancy between statements made in Affidavit # 2 and Dr. Singer's in-court testimony would have actually prevented the jury from attaining a clearer understanding of any of the evidence or facts in issue. Therefore there would be no point in this Court granting the amended motion for new trial."
From this ruling, plaintiff has appealed.
Initially we acknowledge empathy for the trial judge's motivation in more than one respect. Expert witnesses pervade civil litigation today. At least from our perspective, there seem to be few cases tried to juries that do not involve expert witnesses. They are of course a matter of necessity in some causes of action, and medical negligence is certainly one in which expert opinion evidence is indispensable. The customindeed the necessity of using experts has quite apparently created a cottage industry of available expert witnesses in various specialities and even, as the trial judge noted here, for one side or the other in certain kinds of lawsuits. And it is true that forensic specialization in favor of plaintiffs or defendants can raise a logical inference of bias in favor of that side from which one earns such a livelihood. The presence of such bias then leads quite readily to a possibility that the expert does not opine from a perspective ofhow shall we say this?scientific neutrality. Hence the feeling that some forensic opinions are "bought and paid for" in favor of both plaintiffs and defendants is inevitable.
The question thus starkly presented by the trial judge's decision in this case is the extent to which in the exercise of general discretion to admit or exclude evidence under FEC sections 90.702 and 90.704 the judge can police this "traffic" in expert opinions. Looking first to the language of the statutes, we note that section 90.702 provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial."
Section 90.704 adds that:
"The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence."
*123 The trial judge's ruling to strike the expert witness can fairly be understood as implying that section 90.702 operates as an exclusionary rule granting the trial judge discretion to bar expert testimony on subjective grounds. Yet, broadly speaking, section 90.702 does not enlarge judicial discretion to exclude evidence so much as it affords a party in litigation the right to present expert opinions if they meet the statutory standard of "assist[ing] the trier of fact in understanding the evidence or in determining a fact in issue" by testimony from a person "qualified as an expert by knowledge, skill, experience, training, or education." Section 90.704, too, is not actually an exclusionary rule at all but instead merely provides that the facts or data on which that expert bases an opinion "may be ... made known to the expert at or before the trial." [emphasis supplied.] This latter statute does not purport to require that the facts be made known to the expert before he forms an opinion however desirable that may be.
In Kruse v. State, 483 So.2d 1383 (Fla. 4th DCA 1986), concerning the admissibility of expert opinion evidence we said:
"Section 90.702 contains three requirements: (1) that the opinion evidence be helpful to the trier of fact; (2) that the witness be qualified as an expert; and (3) that the opinion evidence can be applied to evidence offered at trial. These provisions embody a liberal policy on the admission of expert evidence, generally rendering such evidence admissible to the extent that it is helpful to the trier of fact. Section 90.403 adds a fourth test barring evidence that, although technically relevant, presents a substantial danger of unfair prejudice that outweighs its probative value."
483 So.2d at 1384. We applied that liberal policy in favor of admitting expert testimony in McBean v. State, 688 So.2d 383 (Fla. 4th DCA 1997), where we reasoned:
"Whether a witness is qualified as an expert is a determination within the sound discretion of the trial court, whose decision will not be reversed on appeal without a clear showing of error or clear abuse of discretion. Likewise, the range of subjects about which an expert may testify in a particular trial is a matter within the trial court's discretion. Although a trial court's decision on the qualifications of an expert ordinarily is conclusive, an appellate court can come to the opposite conclusion when it determines the trial court reached its decision by applying erroneous legal principles." [c.o., emphasis supplied.]
688 So.2d at 385. Similarly in Fridovich v. State, 489 So.2d 143 (Fla. 4th DCA 1986) we reversed a trial judge's decision excluding expert testimony as to the manner of death. Our opinion there appears to suggest that the exclusion of expert testimony that complies with section 90.702 is not within judicial discretion but is instead legal error. To the same effect is Mathieu v. Schnitzer, 559 So.2d 1244 (Fla. 4th DCA 1990), where we held that the trial court's decision as to the qualifications of an expert witness is entitled to great weight on appeal "unless it is shown that the trial court applied erroneous legal principles in arriving at its decision."[8] 559 So.2d at 1245.
Moreover, to some extent the traditional broad discretion of a trial judge to exclude expert testimony in medical negligence cases is limited by the requirements of section 766.102(1) as to the standard of care.[9] In other words, if the statute places *124 the burden on a litigant to offer expert evidence to prove a fact as to which the litigant has the burden of proof, such evidence is therefore deemed per se to be of the kind that will assist the jury in its mission of resolving conflicting factual evidence.
Ironically, the decision as to the admissibility of Dr. Singer's opinion in the present case is affected substantially by our decision in an earlier case also involving Dr. Singer in a medical negligence claim, as here, concerning a delay in diagnosing cancer. In Green v. Goldberg, 630 So.2d 606 (Fla. 4th DCA 1993), that defendant too was a surgeon who challenged the qualifications of Dr. Singer as an oncologist to give an opinion as to his failure as a surgeon to diagnose cancer in a woman.[10] The trial judge agreed with the defendant's challenge and excluded Dr. Singer's testimony for lack of qualifications. We reversed that decision, saying:
"Dr. Singer is an oncologist. Oncology is the very specialty which deals with cancer, including diagnosis and treatment. The trial court based the decision to exclude Dr. Singer's testimony on standard of care because of his statement that the surgeon makes the ultimate decision on whether to do a biopsy. In context, this statement is one of professional courtesy and medical ethics. Obviously, no doctor can compel another to perform surgery. When referral is made from one specialty to the other, the question is not whether the referring doctor makes the decision on performing the procedure, but whether the referring doctor possesses the requisite training, experience and knowledge in a `given field of medicine.' § 766.102(2)(c)(2), Fla. Stat. (1991). In this case, the given field of medicine is breast cancer, not surgery in general. Dr. Singer is a specialist in cancer; the defendant doctor is a general surgeon.
"Dr. Singer was qualified by training, education and experience in the diagnosis of breast cancer and possessed knowledge about the standards relating to when a biopsy should be performed, gained through experience, background and training. He has been actively involved as a cancer specialist within the past five years. This case did not involve a claim of negligent performance of a biopsy, which might involve different expertise inherent to a surgeon. The trial court improperly excluded Dr. Singer's testimony concerning the issue of standard of care in failing to diagnose breast cancer, as well as his opinion on whether a biopsy was indicated."
630 So.2d at 608-609. Other decisions of this and other Florida courts support the proposition that discretion to admit or exclude evidence on the standard of care in medical cases diminishes once the proponent of the evidence establishes prima facie that it satisfies the Evidence Code and the statutory medical negligence requirements.[11]See Myron v. South Broward Hosp. Dist., 703 So.2d 527 (Fla. 4th DCA 1997) (pediatrician was qualified to give opinion as to negligence, if any, of neurosurgeon in failing to perform spinal tap on infant, as pediatrician was well qualified to offer opinion on necessity to perform spinal *125 tap, even by neurosurgeon); Wright v. Schulte, 441 So.2d 660 (Fla. 2d DCA 1983), review denied, 450 So.2d 488 (Fla.1984) (in action against surgeon for alleged negligence in performing abdominal hysterectomy trial judge erred in refusing to permit gynecologist to testify as to standard of care); Lake v. Clark, 533 So.2d 797 (Fla. 5th DCA), review denied, 542 So.2d 1332, and 542 So.2d 1334 (Fla.1988) (physician should have been allowed to testify that standard of care was breached by defendants, in action involving alleged failure of physician and hospital to see to it that surgical team was ready to perform necessary emergency surgery to aid mother and save her babies, and exclusion of testimony was harmful necessitating new trial; physician had training in pediatric medicine, taught obstetrics and gynecology and pediatrics full time at university, and was certified in pediatrics, perinatal and emergency medicine, and as such, had qualifications similar to defendant physician who had specialized training in obstetrics and gynecology). All of the foregoing cases to one degree or another involve a medical expert credentialed in one discrete specialty testifying as to the standard of care of a health care provider credentialed in another.
To be sure, section 766.102 does not make differing Board Certifications dispositive. In this case the critical issue is not the surgical care given by defendant, but his failure during his follow up care to order additional testing that would have resulted in life-saving, earlier diagnosis of the recurrence of her cancer. The testing that defendant is accused of overlooking is, according to testimony by Dr. Singer, recognized by all practitioners in the field of cancer care. The finder of fact may ultimately choose to place little weight on this testimony, but that hardly makes it inadmissible. When a gynecological-oncological surgeon purports to render diagnostic services to a cancer patient, a physician who is an expert in medical oncology is a "similar health care provider" within the meaning of section 766.102(2) even though he is not a surgeon or a gynecologist. Such an expert is not disqualified from testifying merely because the expert is not Board Certified in the surgical and gynecological specialties and does not actually treat gynecological patients. Nor is such an oncologist unqualified merely because his practice is consultative, so long as he continues to maintain his specialization in oncology.
And just as important, there is nothing in sections 90.702, 90.704 or 766.102 that bars a medical expert from forming an opinion before he has reviewed records such as the patient's chart. The letter used to impeach Dr. Singer[12] merely established that, after speaking to plaintiffs counsel, he had formed thoughts and impressions rather than a formal opinion as to the care rendered by defendant. Equally, there is nothing in these statutes precluding a putative expert from forming initial thoughts and impressions about the standard of care of a prospective defendant on the basis of representations made by a claimant's counsel.
After all, if the lawyer making such representations to an expert is unable to produce evidence supporting those representations, the opinions of the medical expert will not be worth very much and may actually be inadmissible at trial for lack of a predicate. The mere fact that the trial judge, who was not the trier of fact, did not believe Dr. Singer's testimony as to when he formed his opinion is immaterial as to the threshold issue of his unchallenged qualifications as a Board Certified oncologist who is qualified to testify as to the standard of care in diagnosing cancer.
We also note that when Dr. Singer's testimony was stricken as unqualified the defendant had not yet adduced contrary *126 evidence. But the primary basis for his motion to strike the testimony was that Dr. Singer was not a "similar health care provider" within the meaning of section 766.102(2)(b). Specifically, at the time of his motion he had not produced any evidence that his specialty was dissimilar to Dr. Singer's. In Charlonne v. Rosenthal, 642 So.2d 632 (Fla. 3d DCA 1994), the court held that:
"In order for the defendant in a medical negligence action to invoke the protection of paragraph 766.102(2)(b), it is necessary for the defendant to make a record showing that he fits within the statutory definition. That showing was not made here."
642 So.2d at 634. There can be no doubt from Dr. Singer's uncontradicted testimony that he has the requisite education, training and experience as a Board Certified Oncologist, and his continued practice in that specialty, to render an opinion as to whether a gynecological-oncological surgeon fell below the standard of care in failing to diagnose a recurrence of cancer. On the other hand there was no direct evidence as to whether defendant was entitled to the protection of section 766.102(2)(b).
Finally we do not find the documentation furnished by defendant after the trial to be even a sufficient after-the-fact rationalization for excluding the testimony of Dr. Singer.[13] There is nothing in the documentation that challenged Dr. Singer's qualifications as an expert on cancer diagnosis. Even if this documentation had been produced during trial, it appears to us relevant merely to the weight of Dr. Singer's testimony but not to his qualifications to give the opinion he gave.
In the end, we have decided that the exclusion of expert evidence in medical negligence cases for the reasons given in this case embroils the trial judge too much in resolving the weight to be given such evidence. It would turn the question of many medical experts' qualifications into a trial within a trial. Such a procedure would hardly serve the broad admissibility purposes of FEC section 90.702. Nor would it carry out the essential purpose of the medical negligence statute requiring that the evidence on standard of care against a specialist be from a similar health care provider. Instead it would substitute a judicial requirement that the testimony on standard of care come only from an identically credentialed practitioner. It is fundamental that judges do not have the power to edit statutes so as to add requirements that the legislature did not include. See Holly v. Auld, 450 So.2d 217 (Fla.1984) (courts lack power to construe unambiguous statutes to extend, modify, or limit express terms). It is therefore necessary in this case that plaintiff have a new trial in which the admissibility of his expert's testimony can be judged by our holding today.
REVERSED.
STONE, C.J., and TAYLOR, J., concur.
NOTES
[1] Actually both sides listed Dr. Singer as an expert witness. Defendant's witness list also noted that Dr. Singer was plaintiff's expert but nevertheless listed Dr. Singer as a person whom the defense would call as a witness. Defendant did not object in the pretrial stipulation to Dr. Singer's qualifications as an expert witness in the subject of the case. Nor did defendant make any pretrial motion in limine to exclude the testimony of Dr. Singer.
[2] Defendant apparently objected to Dr. Singer testifying before he took the stand, but our record does not include that part of the transcript.
[3] See § 766.102(2)(b), Fla. Stat. (1997) ("If the health care provider whose negligence is claimed to have created the cause of action is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself or herself out as a specialist, a `similar health care provider' is one who: 1. Is trained and experienced in the same specialty; and 2. Is certified by the appropriate American board in the same specialty.").
[4] A Tumor Board is a committee of multidisciplinary physician specialistssurgeons, medical oncologists, gynecologists, pathologists, and radiologists,designated to review all cancer cases presented in the hospital.
[5] See § 766.102(1), Fla. Stat. (1997).
[6] See § 90.101 ("This chapter shall be known and may be cited as the `Florida Evidence Code.'"); and §§ 90.702 and 90.704, Fla. Stat. (1997).
[7] This refers to documents filed by defendant along with a motion to strike the affidavit from Dr. Singer attached to plaintiff's motion for new trial. The documents supplied by defendant in this post trial motion were obviously not available to the trial judge or considered by him when he granted the motion to strike the testimony of Dr. Singer during the trial. Among other things, these defense documents showed that: (1) a trial court in Ohio had concluded that Dr. Singer had changed his opinion after three years into litigation; (2) a federal court in Georgia had found that Dr. Singer had formed an opinion based on incomplete charts and records; (3) a deposition taken in Missouri showed that Dr. Singer had never examined the patient or spoken to her doctors and had not researched a certain drug before testifying in the deposition; (4) a federal court in New York had concluded that Dr. Singer had relied on documents that no practitioner in the subject field would use and that his affidavit was unreasonable; (5) in a deposition in North Carolina, Dr. Singer testified that he signed an affidavit prepared by a claimant's lawyer and that he was associated with a professional witness service for medical negligence claimants; and (6) in a case in South Carolina Dr. Singer offered an opinion in an area in which he had no experience and again testified to involvement in a case through a witness service.
[8] We recognize that Vallot v. Central Gulf Lines, 641 F.2d 347 (5th Cir.1981), appears to be contrary to these decisions by Florida state courts. It requires no citation of authority to say that the decisions of Florida District Courts of Appeal are more authoritative on Florida law than are decisions of a federal court. Moreover the nature of the federal claims at issue in Vallot may go a long way toward explaining why Florida law may be different in this regard than is federal procedural and substantive law.
[9] "In any action for recovery of damages based on the death or personal injury of any person in which it is alleged that such death or injury resulted from the negligence of a health care provider as defined in s. 768.50(2)(b), the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers."
[10] In that case the cancer was discovered in the patient's breast, while in the present case the cancer was discovered in the patient's cervix. We do not regard that difference as either legally or factually important.
[11] See §§ 90.702, 90.704 and 766.102.
[12] And need we even bother to mention that the letter, which was not under oath, was directly contradicted by Dr. Singer's courtroom testimony that he formed his opinions only after reviewing the records, which we hasten to add the jury might have believed.
[13] Because this documentation was produced only after the trial in connection with post trial motions, we do not understand how it would justify striking the testimony during trial. It impresses us as ultimately unfair to attempt after a witness has left the stand and a verdict has been directed to use "newly discovered evidence" to justify exclusion of testimony on grounds that might have eliminated with the witness still present.