BLACK, Judge.
Kathleen A. Miulli, as personal representative of the Estate of Matthew Michael Miulli, sued Dr. Erwin S. Shartz and HealthPoint Medical Group, Inc., for medical negligence. Mrs. Miulli alleged that Dr. Shartz’s and HealthPoint’s actions and inactions regarding a sports medical release authorizing her son to play high school baseball proximately caused Matthew Miulli’s death. Because we conclude that Dr. Shartz and HealthPoint were entitled to a directed verdict based on Mrs. Miulli’s failure to sufficiently prove causation, we reverse. Our reversal on this point is determinative and renders the remaining issues on appeal moot.
I. Facts
Matthew Miulli’s death was a tragedy. On January 19, 2005, seventeen-year-old Matthew collapsed during a preseason baseball workout. Despite resuscitative efforts, Matthew died from cardiac arrest due to congenital aortic valve stenosis.
*615 Matthew was born with a heart condition called patent ductus arteriosus and was diagnosed with aortic stenosis shortly after his birth. Aortic stenosis is a progressive heart condition in which the aortic valve “narrows,” inhibiting the heart’s ability to pump blood through the body. This condition put Matthew at risk for sudden, premature cardiac arrest. And because of the aortic stenosis, Matthew was regularly examined by primary physicians and cardiologists throughout his childhood, adolescence, and teen years.
For ten years prior to his death, Matthew was under the care of pediatric cardiologist Dr. Thomas Edwards. Between 1995 and 2001, Matthew saw Dr. Edwards annually for his aortic stenosis. During this time frame Matthew underwent several exercise stress tests and echocardio-grams. Beginning around the time Matthew became a patient of Dr. Edwards’, he also started to play baseball; prior to 2002, Dr. Edwards authorized Matthew to play baseball but not contact sports.
In 2001, Dr. Edwards saw Matthew, noted that he continued to play baseball, and ordered an echocardiogram. The echocar-diogram revealed no new findings, and Dr. Edwards indicated that Matthew would need a stress test before participating in the 2002 baseball season, beginning in January. That stress test was not performed until August 2002. Nonetheless, following that test and an additional test ordered by Dr. Elsa Suh, a pediatric cardiologist and colleague of Dr. Edwards’, on September 10, 2002, Dr. Edwards signed a sports medical authorization form indicating Matthew could participate in all sports except football, with no other restrictions.
Dr. Edwards did not testify during trial; however, according to his records, Dr. Edwards discussed the risks and benefits of Matthew’s participation in sports with Mrs. Miulli and Matthew. Dr. Edwards’ records also indicated that Matthew was to return for a cardiology follow-up in six months and that this information was relayed to Matthew’s father prior to providing the Miullis with the sports authorization form. Mrs. Miulli testified that following the 2002 cardiac examinations, she was under the impression that Matthew did not need to see the cardiologist again for a year and a half or two years. Regardless, it is undisputed that Matthew did not see Dr. Edwards, Dr. Suh, or any other cardiologist between August 2002 and his death in January 2005. It is also undisputed that during that time Matthew continued to play baseball.
In addition to seeing cardiologists, Matthew was treated by primary care physicians at HealthPoint. He was first seen at HealthPoint in 2000, while still a patient of Dr. Edwards’. Between 2000 and 2004, Matthew saw at least two pediatricians employed by HealthPoint, one of which was Dr. Shartz. On July 31, 2003, Matthew saw Dr. Shartz for a physical examination. Dr. Shartz found Matthew to be in good health but also noted that Matthew was overdue for his cardiology exam. According to Dr. Shartz’s records, he advised Matthew’s father to make an appointment for a cardiology follow-up. Matthew did not see a cardiologist in 2003 or 2004.
On August 2, 2004, Mrs. Miulli took Matthew to Dr. Shartz for a physical and completion of a sports medical release, which Mrs. Miulli had obtained from the internet. Dr. Shartz conducted a physical examination and inquired as to when Matthew had last seen a cardiologist. The response to Dr. Shartz’s inquiry was a contested issue at trial. Dr. Shartz testified that Mrs. Miulli told him that Matthew had been to see a cardiologist within the last year and that his cardiac evaluations were current. Mrs. Miulli, however, testified that she told Dr. Shartz it had *616 been “at least a year” since Matthew had seen a cardiologist. In fact, it had been two years. Because Matthew’s records did not include a recent cardiology update, Dr. Shartz noted he would call Dr. Edwards. However, based on his physical examination of Matthew and his conversation with Mrs. Miulli, Dr. Shartz signed the release authorizing Matthew to play sports. The record indicates that prior to 2002 only Dr. Edwards had authorized Matthew’s participation in baseball.[1]
On August 3, 2004, the day after Dr. Shartz signed the sports medical release, he called Dr. Edwards to confirm that Matthew had been cleared to play baseball. During that phone call, Dr. Shartz learned that Matthew had not been to a cardiologist since August 2002. Further, Dr. Edwards advised Dr. Shartz that Matthew was not to play any sports before having a repeat stress test and echocardio-gram. Dr. Shartz testified that after this conversation with Dr. Edwards, he made multiple attempts to contact the Miullis to revoke the authorization to participate in sports. He testified that he repeatedly called and left two voice messages on the family’s answering machine on August 3, two more messages on August 4, another on August 5, and a final message on August 6. He also left a message on Mr. Miulli’s cell phone on August 5. At trial, the Miullis denied receiving the phone messages, despite confirming that the numbers Dr. Shartz called were correct.
In addition to the phone calls, on August 10, 2004, Dr. Shartz mailed letters to the Miullis advising them that Matthew was not to participate in any sports until he saw Dr. Edwards. One letter was sent via regular mail and one was sent via certified mail. At trial, the Miullis denied receiving the letters and denied any knowledge that Dr. Shartz no longer believed Matthew should participate in sports. The Miullis confirmed that the address to which Dr. Shartz mailed the letters was their home address. The letter mailed via regular post was not returned; however, the certified letter was returned to HealthPoint as unclaimed, a fact unknown to Dr. Shartz until much later.[2]
It is undisputed that the medical release obtained by the Miullis in 2004 was unnecessary for Matthew’s participation in preseason baseball workouts and was not used by the Florida High School Athletics Association (FHSAA) or Matthew’s high school for any purpose. The Miullis testified that they did not intend to use the release signed by Dr. Shartz for Matthew’s participation in varsity baseball in January 2005. Both admitted they knew Matthew would need an echocardiogram and stress test before he would be permitted to participate in baseball in January, and both testified that they intended to have Matthew seen by the cardiologist for those tests before the start of the regular season. However, as of the date of his death, Matthew had not been to a cardiologist and did *617 not have a scheduled appointment with a cardiologist or any other doctor.
Prior to trial, Mrs. Miulli retained Dr. Randy Wertheimer as an expert on standard of care. Because Dr. Wertheimer could not be present at trial, her video testimony was introduced and played for the jury. Dr. Wertheimer is a family medicine physician with over thirty years of experience; she is also chair of family medicine at both Tufts University and Cambridge Health Alliance. She is not, however, a cardiologist. In her testimony, Dr. Wertheimer was critical of Dr. Shartz for failing to “close the loop” by confirming that the Miullis understood Matthew was not to participate in sports before seeing his cardiologist. She also criticized Dr. Shartz for signing the sports medical release without first speaking with Matthew’s cardiologist. As a result, she testified that the care provided by Dr. Shartz fell below the prevailing professional standard of care of a reasonably careful physician. Dr. Wertheimer’s conclusion was that Dr. Shartz’s care substantially contributed to Matthew’s death because in his parents’ minds, Matthew had been cleared to play baseball. Dr. Wertheimer also criticized HealthPoint based on its handling of the unclaimed certified letter, specifically its failure to bring to Dr. Shartz’s attention that the letter had been returned. She concluded that HealthPoint’s inaction also substantially contributed to Matthew’s death.
Mrs. Miulli also presented video testimony from Dr. Suh. Dr. Suh testified about her limited treatment of Matthew and about aortic stenosis generally, including that people with the condition are at risk of sudden cardiac arrest. Because Dr. Suh had not seen Matthew between 2002 and the date of his death, she could not provide an opinion as to the specifics of Matthew’s heart condition either at the time of Matthew’s death or five months earlier when Dr. Shartz signed the sports medical release. Dr. Suh did testify, however, that had Matthew returned to her practice for cardiac testing after 2002, she would have ordered an echocardiogram and if there were indicia that Matthew’s aortic stenosis was progressing, she would have done more invasive testing.
Mrs. Miulli’s final physician witness was Dr. Lestek Chrostowski, the Hillsborough County Medical Examiner who performed Matthew’s autopsy. Dr. Chrostowski testified only to the findings made in his report, including that the cause of Matthew’s death was congenital aortic valve stenosis. Dr. Chrostowski, having not been listed as an expert witness, was not permitted to give standard-of-care testimony or opinion testimony related to the cause of Matthew’s death.
During trial, Mrs. Miulli testified that if she had received the letter from Dr. Shartz advising her that Matthew was not to participate in sports until seeing his cardiologist, she would have “immediately made a call.” She did not specify to whom she would have made the call. She also did not testify that she would have taken Matthew to a cardiologist or another physician for immediate testing. She did not testify that she would not have permitted Matthew to participate in baseball conditioning in January 2005; but she did testify that she knew Matthew would need to see a cardiologist before his participation in the 2005 varsity baseball season, beginning in January. Mr. Miulli testified that had he known the information contained in Dr. Shartz’s letter he would have acted on it; however, he provided no specifics on what he would have done. Mr. Miulli did not testify that he would not have permitted Matthew to participate in the January 2005 baseball conditioning.
*618 Following the presentation of Mrs. Miul-li’s evidence and again at the close of all evidence, Dr. Shartz and HealthPoint moved for a directed verdict on causation, arguing that Mrs. Miulli had failed to present sufficient evidence that Dr. Shartz’s and HealthPoint’s actions and inactions proximately caused Matthew’s death. Specifically, they argued that the failure to “close the loop,” as testified to by Dr. Wertheimer, was not the proximate cause of Matthew’s death and that Dr. Wer-theimer’s conclusion was unsupported. They also argued that Mrs. Miulli’s evidence was legally insufficient to prove that HealthPoint’s failure to properly advise Dr. Shartz of the returned letter caused Matthew’s death. The trial court initially reserved ruling on the motion and ultimately denied it.
The jury returned a total verdict in favor of Mrs. Miulli, as representative of Matthew’s estate, in the amount of $2,025,000, assigning 5% liability to the School Board of Hillsborough County,[3] 20% liability to Dr. Shartz, 15% liability to HealthPoint, and 60% liability to the Miul-lis, collectively. Following the verdict, Dr. Shartz and HealthPoint filed a motion to set aside the verdict and to enter judgment in accordance with the prior motion for directed verdict. That motion was denied, and the trial court entered a final judgment against Dr. Shartz and Health-Point totaling $717,728.85.
II. Analysis
The determinative issue on appeal is whether the trial court correctly denied Dr. Shartz and HealthPoint’s motion for directed verdict based on the legal sufficiency of Mrs. Miulli’s expert testimony on causation. That is, whether Dr. Wer-theimer’s testimony was legally sufficient to establish that more likely than not Dr. Shartz’s and HealthPoint’s actions and in-actions proximately caused Matthew Miul-li’s death. Our review of the denial of a motion for directed verdict is de novo. Tarpon Springs Hosp. Found., Inc. v. Reth, 40 So.3d 823, 826 (Fla. 2d DCA 2010).
“To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant’s breach of the standard of care, and that said breach proximately caused the damages claimed.” Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1018 (Fla.1984). With regard to proximate cause, “Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiffs injury.” Id. Stated another way, “a plaintiff in a medical malpractice action must show more than a decreased chance of survival because of a defendant’s conduct.... [T]he plaintiff must show that what was done or failed to be done probably would have affected the outcome.” Id. at 1020. Encompassed within this standard is another: that the plaintiff must establish causation without an impermissible stacking of inferences. See Castillo v. E.I. DuPont De Nemours & Co., Inc., 854 So.2d 1264, 1281 (Fla.2003) (Pariente, J., concurring) (citing Voelker v. Combined Ins. Co. of Am., 73 So.2d 403, 407 (Fla.1954)).
In this case, multiple facts needed to be established in order to create a jury *619 question as to whether Dr. Shartz’s and HealthPoint’s actions and inactions proximately caused Matthew’s death: (1) that had Dr. Shartz “closed the loop” Matthew would not have participated in baseball conditioning; and (2) that had Dr. Shartz “closed the loop” the Miullis would have taken Matthew to a cardiologist, the cardiologist would not have signed a sports medical release, and Matthew would not have participated in baseball conditioning. None of these facts were established at trial.
Dr. Wertheimer was the only retained medical expert witness called by Mrs. Mi-ulli. Dr. Wertheimer testified that Dr. Shartz’s actions and inactions fell below the acceptable standard of care because upon learning that Matthew had not seen Dr. Edwards in more than two years, he did not do enough to “close the loop” and confirm that the Miullis were aware Matthew should not participate in sports until he had been cleared by a cardiologist. For purposes of this appeal, Dr. Shartz has accepted this premise. The problem is that Dr. Wertheimer’s opinion, while arguably accurate as far as it goes,[4] falls short of creating a jury question on causation. Dr. Wertheimer did not testify that had Dr. Shartz spoken with the Miullis or otherwise confirmed with them that he was revoking his medical authorization, Matthew more likely than not would not have participated in baseball conditioning, would not have suffered a cardiac event, and would not have died. She did not and could not testify to these conclusions because there are no facts supporting them. No one testified that Matthew would not have participated in baseball conditioning had Dr. Shartz “closed the loop.” And no one testified that had HealthPoint advised Dr. Shartz of the returned letter, Matthew would not have participated in baseball conditioning. Without that testimony, Dr. Wertheimer’s opinions that Dr. Shartz’s and HealthPoint’s actions and inactions contributed to Matthew’s death are conclu-sory, speculative, and not based on facts presented at trial, requiring an impermissible stacking of inferences. In fact, Dr. Wertheimer’s conclusion that Dr. Shartz’s actions contributed to Matthew’s death because the Miullis believed their son had been cleared to play baseball is directly contradicted by the testimony upon which she relied. The Miullis knew Matthew would need to be evaluated by his cardiologist before the 2005 baseball season began. Here, the causation “testimony was not only well beyond the witness’s ... expertise but totally ‘conclusory in nature ... unsupported by any discernable, factually-based chain of underlying reasoning.’ ” Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Gonzalez, 98 So.3d 1198, 1202 (Fla. 3d DCA 2012) (quoting Div. of Admin. v. Samter, 393 So.2d 1142, 1145 (Fla. 3d DCA 1981)); see also Arkin Constr. Co. v. Simpkins, 99 So.2d 557, 561 (Fla.1957) (“[T]he basis for a conclusion cannot be deduced or inferred from the conclusion itself. The opinion of the expert cannot constitute proof of the existence of the facts necessary to the support of the opinion.”).
Dr. Wertheimer did not and — because she is not a cardiologist — could not opine as to whether Dr. Shartz’s actions contributed to or caused Matthew’s death with any degree of medical probability. Cf. Cox v. St. Josephs Hosp., 71 So.3d 795, 797 (Fla.2011). She did not base her causation conclusion on medical experience or medical literature. Cf. id. She provided no *620 testimony as to Matthew’s heart condition in 2003, 2004, or January 2005. Dr. Wer-theimer acknowledged that the Miullis had a history of failing to follow-up with Matthew’s cardiologist; she testified that she believed the Miullis were in denial about their son’s condition. She also acknowledged that Mrs. Miulli knew Matthew was overdue for a cardiology exam and would need one prior to the 2005 baseball season.[5] In effect, Dr. Wertheimer acknowledged that the Miullis knew the general content of Dr. Shartz’s letter in late 2004 and January 2005, regardless of whether they received the letter. The Miullis’ testimony, as relied upon by Dr. Wertheimer, established that this knowledge had no impact on whether Matthew participated in baseball conditioning.
“The opinion of an expert is not sufficient to eliminate the necessity of proving the foundation facts necessary to support the opinion.” Harris v. Josephs of Greater Miami, Inc., 122 So.2d 561, 562 (Fla.1960). Here, contrary to the testimony and records with which she was presented, Dr. Wertheimer assumed that had the Miullis received Dr. Shartz’s letter or phone calls, they would have taken Matthew to a cardiologist, that the cardiologist would have prohibited Matthew from participating in baseball or baseball conditioning, and that the Miullis would have followed that prohibition when a medical authorization was unnecessary for baseball conditioning. See Posner v. Walker, 930 So.2d 659, 665 (Fla. 3d DCA 2006).
As a pediatric cardiologist, Dr. Suh was the only expert called by Mrs. Miulli who was arguably qualified to address Matthew’s heart condition. However, because she had not seen Matthew in over two years prior to his death, Dr. Suh could not testify regarding Matthew’s condition in August 2004 or January 2005. Further, she was not asked to opine whether Matthew might have been medically released to play baseball in 2004 only to have his condition worsen by January 2005. Dr. Suh’s testimony is best described as general information about aortic stenosis without specific application to Matthew’s case. She offered no opinion whatsoever on causation.
The record is devoid of testimony from either side on the state of Matthew’s cardiac health either in August 2004 when Dr. Shartz signed the sports medical release or in January 2005 when Matthew passed away. There was no evidence that had the Miullis been aware of Dr. Shartz’s revocation that they would have (1) kept Matthew from participating in baseball conditioning or (2) taken Matthew to see a cardiologist who would have found Matthew unfit to play baseball. Further, no physician testified whether, assuming Matthew was seen by a cardiologist in August 2004, he might have been cleared to participate in baseball, only to have his condition progressively worsen by the time of his death so as to create the risk that led to his passing.
In sum, there is no record evidence as to what the Miullis would have done had Dr. Shartz “closed the loop,” and none about Matthew’s heart condition beyond August 2002. The jury was necessarily left to speculate and make inferences about these critical issues, requiring entry of a directed *621 verdict in favor of Dr. Shartz and Health-Point. See ERP Operating Ltd. P’ship v. Sanders, 96 So.3d 929, 933 (Fla. 4th DCA 2012) (reversing for entry of directed verdict where plaintiff failed to establish how assailants gained entry to apartment and therefore failed to prove causation); Hollywood Med. Ctr., Inc. v. Alfred, 82 So.3d 122, 126 (Fla. 4th DCA 2012) (concluding that plaintiff presented no evidence on causation with respect to nurses’ negligence where no testimony established that had the nurses monitored the patient earlier and more carefully the patient would have survived).
We are conscious of the admonition in Cox v. St. Josephs Hospital against substituting our evaluation of conflicting evidence for that of the jury. See 71 So.3d at 800. We are not reweighing the evidence. There is no disagreement about Matthew’s heart condition beyond 2002 and no conflict about what may have happened had Matthew seen a cardiologist in the two years preceding his death because there is a glaring lack of testimony about it, leaving nothing for the jury to weigh in the first instance. Cf. Hughes v. Slomka, 807 So.2d 98, 100 (Fla. 2d DCA 2002) (stating that motions for directed verdict must be denied when evidence is conflicting or contradictory).
The facts of this case are those warned of in Gooding, wherein the supreme court disapproved relaxing the causation requirement. The court warned of the injustices created when health care providers are forced to defend cases “where serious disease processes are not arrested because another course of action could possibly bring a better result.” 445 So.2d at 1019-20. Here, Matthew possibly could have lived had Dr. Shartz refused to sign the sports medical release or had he confirmed that the Miullis understood he had revoked his authorization. But possibly is not the standard. And here, even those possibilities hinged more upon the actions of the Miullis than on Dr. Shartz or HealthPoint. Matthew possibly could have lived had Dr. Shartz not signed the release five months prior to Matthew’s death and had Matthew’s parents not allowed him to participate in baseball conditioning, for which the release was unnecessary. Matthew possibly could have lived had the Miullis known that Dr. Shartz revoked the release and not allowed him to participate in baseball conditioning until he was cleared by a cardiologist.
This case falls directly within the holding of Gooding: “a plaintiff in a medical malpractice action must show more than a decreased chance of survival because of a defendant’s conduct.” 445 So.2d at 1020. “ ‘A mere possibility of ... causation is not enough; and when the matter remains one of pure speculation or conjecture ... it becomes the duty of the court to direct a verdict for the defendant.’” Id. at 1018 (quoting W. Prosser, Law of Torts § 41 (4th ed. 1971)). We reverse the final judgment and remand with instructions that judgment be entered in favor of Dr. Shartz and HealthPoint.
Reversed and remanded with instructions.
KELLY and KHOUZAM, JJ., Concur.

. In 2002, another pediatrician at Health-Point signed a Florida High School Athletic Association preparticipation physical evaluation conditionally clearing Matthew for participation in baseball upon the completion of the scheduled stress test and per Matthew’s cardiologist. In 2003, and within one year of Matthew's last cardiology examination, Dr. Shartz signed a participation form. It is unclear whether that authorization was conditioned upon Matthew completing additional cardiology testing; however, Dr. Shartz's records indicate that the Miullis were reminded that Matthew needed to follow-up with his cardiologist.

. It is the failure of HealthPoint to inform Dr. Shartz of the returned certified letter that forms the basis of Mrs. Miulli's claims against it.

. In a separate action, Mrs. Miulli sued the School Board of Hillsborough County (School Board) and the FHSAA. The FHSAA was dismissed from the lawsuit, see Miulli v. Fla. High Sch. Athletic Ass'n, 998 So.2d 1155 (Fla. 2d DCA 2008), and the action against the School Board was consolidated with the action against Dr. Shartz and HealthPoint for trial. Following the verdict, the case against the School Board was resolved and those claims were dismissed.

. We were not asked to consider whether Dr. Shartz’s "failure to close the loop” is a breach of the standard of care or otherwise negligent. And nothing in this opinion should be construed as a ruling or comment on that issue.

. This testimony is the result of cross-examination. Mrs. Miulli relies heavily on the Fourth District’s opinion in Myron v. South Broward Hospital District, 703 So.2d 527 (Fla. 4th DCA 1997), in arguing that Dr. Shartz and HealthPoint’s failure to challenge the factual basis for Dr. Wertheimer’s opinion pre-eludes them from raising the adequacy of her opinion in this appeal. Mrs. Miulli’s reliance on Myron is inapposite. In our case, Dr. Wertheimer was cross examined and challenged on a number of facts underlying the basis of her opinion.