937 So.2d 114 (2006)
STATE of Florida, etc., et al., Appellants,
v.
PRESIDENTIAL WOMEN'S CENTER, et al., Appellees.
No. SC04-2186.
Supreme Court of Florida.
April 6, 2006.
Rehearing Denied August 10, 2006.
*115 Charles J. Crist, Jr., Attorney General, Christopher M. Kise, Solicitor General, Louis F. Hubener, Chief Deputy Solicitor General, John J. Rimes, III, Senior Assistant Attorney General, and James A. Peters, Special Counsel, Tallahassee, FL, for Appellants.
Marshall J. Osofsky of Moyle, Flanigan, Katz, Raymond and Sheehan, P.A., West Palm Beach, FL; Bebe J. Anderson and Nan Strauss of Center for Reproductive Rights, New York, NY; and Barry M. Silver, Boca Raton, FL, for Appellees.
Mathew D. Staver, Erick W. Stanley, Anita, L. Staver, Rena M. Lindevaldsen and Lindsey F. Martin of Liberty Counsel, Longwood, FL, and Teresa Stanton Collett, Profession of Law, University of St. Thomas School of Law, Minneapolis, MN, on behalf of Christian Medical Association and Catholic Medical Association; Jo Ann Barone Kotzen of Kotzen Law, West Palm Beach, FL on behalf of American College of Obstetricians and Gynecologists, Florida Section (ACOG-FS); and Donna Lee, New York, NY on behalf of Florida Association of Planned Parenthood Affiliates, Planned Parenthood of Southwest and Central Florida, Planned Parenthood of South Palm Beach and Broward Counties, Planned Parenthood of the Palm Beach and Treasure Coast Area, Planned Parenthood of Collier County, Planned Parenthood of North Central Florida, American Civil Liberties Union of Florida, and American Civil Liberties Union Reproductive Freedom Project, for Amici Curiae.
LEWIS, J.
We have on appeal State v. Presidential Women's Center, 884 So.2d 526 (Fla. 4th DCA 2004), in which the Fourth District Court of Appeal declared section 390.0111 of the Florida Statutes invalid. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we reverse the district court's decision and remand for further proceedings.

BACKGROUND
In 1997, the Florida Legislature enacted subsection 390.0111, Florida Statutes, titled the "Woman's Right to Know Act" (hereinafter "the Act"). See ch. 97-151, § 1, Laws of Fla. The Act essentially prohibits termination of pregnancy procedures from being performed or induced unless either the referring physician or the physician performing the procedure first obtains informed and voluntary written consent from the patient. See § 390.0111(3), Fla. Stat. (2005).[1]
*116 Respondents (collectively "Presidential") filed a complaint in the Fifteenth Judicial Circuit Court alleging that the Act violates the Florida and United States Constitutions. After a hearing, the trial court issued a temporary injunction enjoining enforcement of the Act. The Fourth District affirmed. See State v. Presidential Women's Ctr., 707 So.2d 1145 (Fla. 4th DCA 1998).
Presidential subsequently moved for the entry of a summary judgment, specifically asserting that subsection (3)(a)(1) of the Act violates the right to privacy under the Florida Constitution and is unconstitutionally vague under the due process clauses of the Florida and United States Constitutions. The trial court agreed with Presidential, held that the Act was unconstitutional on its face, granted Presidential's motion, and entered the summary judgment requested. On appeal, the Fourth District affirmed the trial court's order in full. See State v. Presidential Women's Ctr., 884 So.2d 526 (Fla. 4th DCA 2004) (hereinafter Presidential).
The State has appealed the Fourth District's decision, and we have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.

ANALYSIS
Our standard of review in the instant proceeding is de novo. See Major League Baseball v. Morsani, 790 So.2d 1071, 1074 (Fla.2001) (stating that a trial court's ruling on a motion for summary judgment posing a pure question of law is subject to de novo review). However, in considering the constitutionality of subsection (3)(a)(1) of the Act, we adhere to the settled principle that "[w]hen two constructions of a statute are possible, one of which is of questionable constitutionality, the statute must be construed so as to avoid any violation of the constitution." Indus. Fire & Cas. Ins. Co. v. Kwechin, 447 So.2d 1337, 1339 (Fla.1983); see also Hiers v. Mitchell, 95 Fla. 345, 116 So. 81, 84 (1928) (noting that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter").
We begin our analysis by noting that the Act is fundamentally an informed consent statute. Under the doctrine of informed consent, a physician has an obligation to advise his or her patient of the material risks of undergoing a medical procedure. See Thomas v. Berrios, 348 So.2d 905, 907 (Fla. 2d DCA 1977). Unless a person knows the risks and dangers of such a procedure, "a `consent' does not represent a choice and is ineffectual." Bowers v. Talmage, 159 So.2d 888, 889 (Fla. 3d DCA 1963). The doctrine of informed consent is well recognized, has a long history, and is grounded in the common law and based in the concepts of bodily integrity and patient autonomy. We agree with the well-articulated view that:
Under a free government, at least, the free citizen's first and greatest right, which underlies all othersthe right to the inviolability of his person; in other words, the right to himselfis the subject of universal acquiescence, and this right necessarily forbids a physician or surgeon, however skillful or eminent, who has been asked to examine, diagnose, advise, and prescribe (which are at least necessary first steps in treatment *117 and care), to violate, without permission, the bodily integrity of his patient by a major or capital operation, placing him under an anaesthetic for that purpose, and operating upon him without his consent or knowledge. 1 Kinkead on Torts, § 375, states that general rule on this subject as follows: The patient must be the final arbiter as to whether he will take his chances with the operation, or take his chances of living without it.
Chambers v. Nottebaum, 96 So.2d 716, 719 (Fla. 3d DCA 1957) (internal quotation marks omitted) (quoting Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 14-15 (1905)); see also Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 269, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) ("`[N]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment.") (citation omitted) (quoting Union Pacific Ry. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891)). As this Court stated in 1990:
[E]veryone has a fundamental right to the sole control of his or her person. As Justice Cardozo noted seventy-six years ago:
Every human being of adult years and sound mind has a right to determine what shall be done with his own body....
An integral component of self-determination is the right to make choices pertaining to one's health, including the right to refuse unwanted medical treatment....
... The issue involves a patient's right of self-determination and does not involve what is thought to be in the patient's best interests.
More is involved in respect for self-determination than just the belief that each person knows what's best for him- or herself.... Even if it could be shown that an expert (or a computer) could do the job better, the worth of the individual, as acknowledged in Western ethical traditions and especially in Anglo-American law, provides an independentand more importantground for recognizing self-determination as a basic principle in human relations, particularly when matters as important as those raised by health care are at stake.
In re Guardianship of Browning, 568 So.2d 4, 10 (Fla.1990) (citations omitted).
The State of Florida has further codified the doctrine of medical informed consent generally in section 766.103 of the Florida Statutes.[2] Moreover, the Florida Legislature *118 has enacted statutes that have application and govern the concept of informed consent in specific contexts. See, e.g., § 458.324, Fla. Stat. (2005) (breast cancer); § 458.325, Fla. Stat. (2005) (electroconvulsive and psychosurgical procedures); § 945.48, Fla. Stat. (2005) (inmates receiving psychiatric treatment).
The termination of a pregnancy is unquestionably a medical procedure and we conclude that, as with any other medical procedure, the State may require physicians to obtain informed consent from a patient prior to terminating a pregnancy. This basic premise is without dispute in this litigation. No legitimate reason has been advanced to support a theory that physicians who perform these procedures should not have an obligation to notify their patients of the risks and alternatives to the procedure. Further, we do not view those patients requesting this medical procedure to be less concerned than patients having other medical treatments with regard to the risks and alternatives of that medical procedure, or such information as being less pertinent to an informed patient's decision to undergo or not undergo the procedure. Therefore, it is reasonable to conclude that if the informational requirements of subsection 3(a)(1) are comparable to those of the common law and other Florida informed consent statutes implementing the common law, this subsection which addresses informed consent certainly may have no constitutional prohibition or generate the need for an analysis on the issue of constitutional privacy.
In considering whether the informational requirements of subsection (3)(a)(1) are analogous to the common law or other informed consent statutes implementing the common law concept, we first review Presidential's vagueness challenges because the interpretation of the language of the provision is determinative of this issue. Presidential contends that requiring physicians to inform patients of "[t]he nature and risks of undergoing or not undergoing the proposed procedure that a reasonable patient would consider material to making a knowing and willful decision of whether to terminate a pregnancy," § 390.0111(3)(a)(1)(a), Fla. Stat. (2005), is unconstitutionally vague on two separate grounds.
First, Presidential asserts that the term "reasonable patient" is vague because it requires physicians to speculate as to what information a hypothetical reasonable patient would consider material to her decision and inform all patients contemplating a termination of pregnancy of this information, regardless of whether it is in any way relevant to the particular patient who is presenting herself for this medical intervention. Presidential claims that the standard is vague because it does not contain express language limiting the provision of information to what a reasonable patient under the patient's circumstances would consider material to her decision. Presidential contends that patients seeking terminations of pregnancy are diverse and, therefore, the Act affords treating physicians for this procedure no guidance as to what information must be provided to patients, or how one satisfies or complies with this statutory requirement.
Second, Presidential asserts that subsection (3)(a)(1)(a) of the Act is unconstitutionally vague because in their view this *119 provision is unclear as to whether physicians must inform patients of the nonmedical risks of undergoing or foregoing this medical treatment. In support of this argument, Presidential notes that while subsection (3)(a)(1)(c) of the Act requires physicians to notify patients of "[t]he medical risks to the woman and fetus of carrying the pregnancy to term" (emphasis supplied), subsection (3)(a)(1)(a) requires physicians to inform patients of "[t]he nature and risks of undergoing or not undergoing the proposed procedure." § 390.0111(3)(a)(1)(a),(c), Fla. Stat. (2005). Since the word "medical" is present in subsection (3)(a)(1)(c), but is omitted from subsection (3)(a)(1)(a), Presidential asserts that subsection (3)(a)(1)(a) may be read to encompass nonmedical risks, which would produce impermissible vagueness.
We reject both of Presidential's assertions. First, we disagree that subsection (3)(a)(1)(a) requires physicians to inform those patients presenting themselves for this treatment as to what a generalized, nondescript, abstract, hypothetical "reasonable patient" would consider material when providing the informed consent information. As this case has developed, and during oral argument, the State has asserted and agreed that the "reasonable patient" under subsection (3)(a)(1)(a) is only and specifically the patient who is presenting herself for the procedure, and, therefore, the doctor need only consider, address, and inform based on that patient's individualized circumstances in determining what information is material and to be provided as the "informed consent." We adopt the State's interpretation of the "reasonable patient" language because statutory provisions should not be construed in a manner that would lead to an absurd result, see Warner v. City of Boca Raton, 887 So.2d 1023, 1033 n. 9 (Fla.2004), and it would be illogical to require physicians who perform this treatment to provide the identical standardized information to every patient, even when that information would be completely irrelevant to the patient's individual circumstances. Indeed, such a practice would defeat the very purpose of informed consent by overwhelming and possibly confusing the patient with immaterial information. Moreover, even though Florida's general consent law includes the words "under the circumstances" when describing the reasonable patient standard, see supra note 2, we agree with the State and conclude that the mere absence of these words from the Act does not render the provision unconstitutionally vague. Even without the precise language, we conclude that the Act is to be rationally and reasonably construed, as advanced by the State, to require a physician to consider only and exclusively the individual circumstances of each patient presenting herself for treatment in determining what information is material to that patient's decision. See generally Indus. Fire, 447 So.2d at 1339; Hiers, 116 So. at 84.
We further reject Presidential's contention that subsection (3)(a)(1)(a) must be read to encompass nonmedical risks. As this litigation developed, and during oral argument, the State has agreed and conceded that this subsection applies solely and exclusively to information with regard to medical risksnot information with regard to social, economic, or any other risks. The doctrine of medical informed consent is rooted in the concepts of bodily autonomy and integrity, see Chambers, 96 So.2d at 719, and it is logical that physicians be required to inform the patient only and exclusively of the medical risks of terminating or not terminating a pregnancy. Physicians are not sociologists, economists, theologians, or philosophers, and it is implausible to conclude that the Legislature intended that physicians be required *120 to venture far beyond their professional specialty and expertise to advise patients of nonmedical matters merely because the word "medical" is not specifically utilized in subsection (3)(a)(1)(a).[3]Cf. Arato v. Avedon, 5 Cal.4th 1172, 23 Cal.Rptr.2d 131, 858 P.2d 598, 608-09 (1993) (recognizing the "therapeutic limitation inherent in the doctrine of informed consent" and finding "[t]he fact that a physician has fiducial obligations which . . . prohibit misrepresenting the nature of the patient's medical condition, does not mean that he or she is under a duty, the scope of which is undefined, to disclose every contingency that might affect the patient's nonmedical rights and interests" (internal quotation marks omitted)).
By interpreting the term "reasonable patient" to be a reasonable patient under the particular patient's circumstances, and the word "risks" to encompass solely and exclusively medical risks, we agree with the State and conclude that subsection (3)(a)(1) of the Act constitutes a neutral informed consent statute that is comparable to the common law and to informed consent statutes implementing the common law that exist for other types of medical procedures[4]it requires the physician to describe the medical procedure to the patient and inform her of the medical risks of having a termination procedure and carrying a pregnancy to term.[5] Moreover, we conclude that subsection (3)(a)(1)(a), when its terms are construed in the manner we have described, is not "so vague that men of common intelligence must necessarily guess at its meaning." D'Alemberte v. Anderson, 349 So.2d 164, 166 (Fla.1977) (quoting Cline v. Frink Dairy Co., 274 U.S. 445, 459, 47 S.Ct. 681, 71 L.Ed. 1146 (1927)). Subsection (3)(a)(1) can be construed in a manner that avoids any violation of the Florida and the United States Constitutions, see Indus. Fire, 447 So.2d at 1339; Hiers, 116 So. at 84, and, therefore, we conclude that the lower courts erred in holding that the Act is unconstitutional on the basis of this particular subsection.[6]

*121 COSTS
On appeal, the Fourth District awarded attorneys' fees to Presidential, conditioned on the trial court determining that Presidential is the prevailing party. The State sought review of this award, claiming that the Fourth District erred in affirming the trial court's award of summary judgment.[7] Because we have concluded that the Fourth District erred in holding that the Act is unconstitutional, we vacate the Fourth District's award of attorneys' fees to Presidential at this time.

CONCLUSION
We conclude that section 390.0111(3)(a)(1) of the Florida Statutes is not unconstitutional. Accordingly, we reverse the Fourth District's decision in Presidential which affirmed the summary final judgment in favor of Presidential holding that the unconstitutionality of this subsection renders the Act facially unconstitutional and remand for further proceedings consistent with this opinion.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., specially concurs with an opinion, in which ANSTEAD and QUINCE, JJ., concur.
PARIENTE, C.J., specially concurring.
The majority has construed section 390.0111(3)(a)(1), Florida Statutes (2005), to be a neutral informed consent statute that is comparable to other informed consent statutes and the common law from which they are derived. With the statute so limited, I concur in upholding its constitutionality. I write to emphasize that it is only because of two significant limitations placed on this provision by the majority that the Act is not facially unconstitutional, and that it was the State at oral argument that made these two substantial concessions limiting the interpretation of this statute. The first is that the "reasonable patient" is not a hypothetical patient but rather is the patient presenting herself for the procedure. The second is that subsection (3)(a)(1)(a) requires physicians to inform patients of only medical risks and not other types of risks such as social or economic risks.
If the State had advanced these substantial limiting constructions from the outset, this case could have been resolved expeditiously either before the trial court or the Fourth District Court of Appeal. Without the benefit of these clear concessions from the State, I cannot fault the Fourth District for concluding that the plain language of the statute is unconstitutionally vague. See State v. Presidential Women's Ctr., 884 So.2d 526, 533-34 (Fla. 4th DCA 2004).
Lastly, as the majority points out, our review is limited to the informed consent provisions in subsection (3)(a)(1) of the Act. Therefore, when this matter is returned to the trial court, it is with the understanding that the other portions of the Act challenged by the Presidential Women's Center in its initial complaint remain to be considered. Our decision in this case expresses no opinion on the constitutionality of these other sections of the Act.
ANSTEAD and QUINCE, JJ., concur.
NOTES
[1] The relevant portion of the Act provides:

(3) CONSENTS REQUIRED.A termination of pregnancy may not be performed or induced except with the voluntary and informed written consent of the pregnant woman or, in the case of a mental incompetent, the voluntary and informed written consent of her court-appointed guardian.
(a) Except in the case of a medical emergency, consent to a termination of pregnancy is voluntary and informed only if:
1. The physician who is to perform the procedure, or the referring physician, has, at a minimum, orally, in person, informed the woman of:
a. The nature and risks of undergoing or not undergoing the proposed procedure that a reasonable patient would consider material to making a knowing and willful decision of whether to terminate a pregnancy.
b. The probable gestational age of the fetus at the time the termination of pregnancy is to be performed.
c. The medical risks to the woman and fetus of carrying the pregnancy to term.
§ 390.0111(3)(a)(1), Fla. Stat. (2005).
[2] Section 766.103, Florida Statutes, provides, in pertinent part:

No recovery shall be allowed in any court in this state against any physician ... in an action brought for treating, examining, or operating on a patient without his or her informed consent when:
(a)1. The action of the physician ... in obtaining the consent of the patient ... was in accordance with an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community; and
2. A reasonable individual, from the information provided by the physician ... under the circumstances, would have a general understanding of the procedure, the medically acceptable alternative procedures or treatments, and the substantial risks and hazards inherent in the proposed treatment or procedures, which are recognized among other physicians ... in the same or similar community who perform similar treatments or procedures; or
(b) The patient would reasonably, under all the surrounding circumstances, have undergone such treatment or procedure had he or she been advised by the physician ... in accordance with the provisions of paragraph (a).
§ 766.103(3), Fla. Stat. (2005).
[3] See Maggio v. Fla. Dep't of Labor & Emp. Sec., 899 So.2d 1074, 1076 (Fla.2005) ("When construing a statutory provision, legislative intent is the polestar that guides the Court's inquiry.") (internal quotation marks omitted); see also Scenic Hills Utility Co. v. City of Pensacola, 156 So.2d 874, 876 (Fla. 1st DCA 1963) ("In the drafting of a statute there is no magic in the presence or absence of a particular word. It is the duty of the Court to examine the enactment as a whole in order to determine its meaning. The failure to use a word very commonly used to express a certain thought is a circumstance to be considered in arriving at the legislative intent. But the failure to use a particular word does not mean that the legislature cannot express the meaning of that word in other language. If the intent of the legislature is clear and unmistakable from the language used it is the duty of the Court to give effect to that intent.").
[4] See, e.g., § 458.324, Fla. Stat. (2005) ("Each physician treating a patient who is, or in the judgment of the physician is at high risk of being, diagnosed as having breast cancer shall inform such patient of the medically viable treatment alternatives available to such patient; shall describe such treatment alternatives; and shall explain the relative advantages, disadvantages, and risks associated with the treatment alternatives to the extent deemed necessary to allow the patient to make a prudent decision regarding such treatment options.").
[5] Further, to the extent that the Act permits only the performing physician or a referring physician to provide the informed consent information, we note that other informed consent statutes, including the general medical consent statute, require a physician to provide the informed consent information. See supra notes 2, 4.
[6] Although Presidential's motion for summary judgment addressed only subsection (3)(a)(1) of the Act, the complaint that Presidential filed with the circuit court more broadly challenged the constitutionality of other provisions of the Act as well. However, the district court's affirmance of the summary final judgment only addresses subsection (3)(a)(1) of the legislation, and our decision today is limited to consideration of that subsection.
[7] The trial court also awarded Presidential attorneys' fees and costs; however, the State did not seek review of the trial court's award.