PER CURIAM.
In this medical-malpractice case, the key issue is whether the plaintiff presented competent substantial evidence that the defendant proximately caused the death of Leo Aragon. We conclude that the plaintiff presented evidence that could support a jury finding that the defendant more likely than not caused the death of Aragon. It is the jury’s province, not the judge’s, to weigh conflicting evidence and assess the credibility of the witnesses, and the testimony given by plaintiffs expert witnesses was not speculation based upon the standard set forth by this Court in Hancock v. Schorr, 941 So.2d 409 (Fla. 4th DCA 2006), and the Florida Supreme Court in Cox v. St. Josephs Hosp., 71 So.3d 795 (Fla.2011). Because the trial judge erred in granting a motion for judgment in accordance with the motion for directed verdict against the plaintiff notwithstanding a jury verdict, we reverse.
STANDARD OF REVIEW
In a de novo review of a trial court’s granting of a motion for judgment in accordance with the motion for directed verdict, an appellate court must view the evidence, resolve all conflicts in the evidence, and construe every reasonable conclusion that may be drawn from the evidence in the light most favorable to the non-moving party. Hancock, 941 So.2d at 412.
FACTS
Viewed in the light most favorable to the plaintiff, the evidence at trial was as follows.
Leo Aragon, forty-one, and married with children, woke up on Sunday, November 7, *889 2004 with chest pain. He entered the emergency room of Memorial Regional Hospital at around 11:50 a.m. Aragon complained of symptoms commonly associated with acute coronary syndrome: left arm and left chest pain, which radiated to his neck and back, nausea, mild shortness of breath, and elevated blood pressure. Aragon was significantly overweight and allergic to shellfish. His shellfish allergy was noted in his hospital chart and he wore a wrist band indicating his shellfish allergy.
A patient with a shellfish allergy is more likely to have an adverse anaphylactic reaction to the iodine-based contrast dye used in cardiac catheterization procedures.
Both the EKG and cardiac-enzyme tests ordered by the emergency-room doctor returned a normal result. The cardiac-enzyme test is used to detect troponin, the presence of which is an indication of a heart-muscle injury. However, it usually takes a few hours for the cardiac-enzyme test to return a positive result. Therefore, the test should always be repeated.
The emergency-room doctor contacted the service of Aragon’s primary-care doctor to recommend admission to the hospital. Dr. Moisés Issa, an internal medicine physician (the “Internist”), was on call to cover for Aragon’s primary-care physician that Sunday. He returned the emergency-room doctor’s phone call at about 3:50 p.m.
By that time, Aragon’s chest pain had subsided. His blood pressure had come down and was approaching normal. After consulting with the emergency-room doctor, the Internist issued a telephone order admitting Aragon to the hospital. The purpose of the admission was to monitor Aragon in the hospital’s telemetry unit for twenty-four hours to determine whether Aragon had suffered a myocardial infarction.
By phone, the Internist also ordered two additional cardiac-enzyme tests to be administered every eight hours from the initial noon test to monitor any changes in the troponin level. The Internist did not see the patient in person nor did he contact the telemetry unit to inquire about the cardiac-enzyme test results later that day.
The second cardiac-enzyme test was administered at 9:30 p.m. and the third test was administered at 4:55 a.m. the next morning. Although the 9:30 p.m. test showed a positive result for the presence of troponin, the Internist was not informed by a nurse via telephone of the positive test results until approximately 7:20 a.m. the next morning. The Internist realized the significance of the troponin-positive cardiac-enzyme test result and decided to involve a cardiologist with Aragon’s treatment.
The Internist called Dr. Randy Gould (the “Initial Cardiologist”), and reached him at home. During their approximately two-minute telephone conversation, the Internist informed the Initial Cardiologist that he had a patient at the hospital with chest pain, positive cardiac enzymes, and in need of a cardiac catheterization. The Initial Cardiologist responded with “Okay, I will take care of it.”
The Internist went to the hospital to see Aragon. The Internist took Aragon’s history and gave him a physical examination at 8 a.m. He learned that Aragon was overweight. Aragon had been stable, pain-free, and his medical record indicated that Aragon had a shellfish allergy. The Internist noted that Aragon’s second cardiac-enzyme test was positive. But he did not find out the results of the third test. As it turned out, the level of cardiac enzymes was still positive, but the level was lower than that of the second test. The Internist made a note in Aragon’s chart that Aragon “will go to cath[eterization] *890 lab later,” and the Internist will “continue to take care of the patient while here in the hospital.”
Even though the Internist gained additional information by seeing Aragon in person and reviewing Aragon’s record, the Internist did not call the Initial Cardiologist to relate to'him this new and more complete information. The Internist also made no plans regarding Aragon’s shellfish allergy and the planned cardiac cath-eterization.
The physical examination at 8 a.m. was the last involvement the Internist had with Aragon’s treatment. Later that evening, the Internist received information from Aragon’s primary-care doctor that Aragon had passed away during the catheterization procedure. It was then that the Internist found out for the first time that Dr. Mian Hasan (the “Interventional Cardiologist”) was the cardiologist who performed the procedure.
When the Initial Cardiologist received the Internist’s phone call in the morning, he related the information he received from the Internist — a gentleman with chest pain, elevated cardiac enzymes, and in need of catheterization — to the Inter-ventional Cardiologist.
The Interventional Cardiologist was under the impression that the Initial Cardiologist had already completed an evaluation and that he was asked to do a procedure, instead of a cardiology consultation on the patient. The Interventional Cardiologist was not available until 4 p.m. that day, and he scheduled Aragon’s cardiac catheterization at that time. Because the Internist did not pass along the information regarding Aragon’s latest condition to the Initial Cardiologist, the Interventional Cardiologist, as the last person in the communication chain, did not know that Aragon was overweight, had been pain-free, had a shellfish allergy, and that the level of tro-ponin had dropped. The Interventional Cardiologist only learned of this information for the first time between 3 and 4 p.m. in the holding area of the catheterization lab.
Based on his understanding that the cardiac catheterization had to be performed that day and that some ongoing risks associated with Aragon’s cardiac condition would evolve, the Interventional Cardiologist decided to operate on an emergency basis and proceeded with a single dose of solucortef (a form of steroid) given to Ara-gon less than one hour before the cardiac catheterization to prevent an anaphylactic reaction to the contrast dye.
The Interventional Cardiologist gave Ar-agon one cc of contrast dye and observed his reaction. Within a very short time, Aragon developed an anaphylactic reaction. His airway had swollen up and was blocked. Despite the efforts of the Inter-ventional Cardiologist and other doctors who were mobilized to assist him, Aragon could not be revived.
Robert Aragon, personal representative of the Estate of Leo Aragon (the “Estate”), brought a medical-malpractice suit against the Internist and Primary Care Physicians of Hollywood, P.A., the Initial Cardiologist, and the hospital for the wrongful death of Aragon. The Interven-tional Cardiologist settled with the Estate and was not a party to this case. The hospital also settled with the Estate before trial.
During the jury trial, the Interventional Cardiologist, as a fact witness, testified that he was under the impression that Aragon had been having intermittent chest pain and that, combined with the positive cardiac-enzyme test results, qualified Ara-gon as an unstable patient.
According to the Interventional Cardiologist, because the patient had been placed *891 in the catheterization area, it meant that a decision had been made that the patient had been evaluated as needing a catheteri-zation even before he was seen by the Interventional Cardiologist. The Internist’s note “will go to cath[eterization] lab later,” in Aragon’s chart meant that it had already been pre-arranged that the cathet-erization was going to occur that day. After reviewing Aragon’s record, the Inter-ventional Cardiologist advised Aragon that he agreed with the planned course of action of performing a cardiac catheterization for Aragon.
The Interventional Cardiologist’s decision regarding the pre-treatment plan for shellfish allergy was dependent upon how soon the procedure needed to be done. The Interventional Cardiologist testified that if he knew he had the luxury of time, he would have implemented a more rigorous pre-treatment plan that would have involved taking steroids orally twelve, eighteen, or twenty-four hours in advance. Additionally, if a consulting cardiologist had initiated a more comprehensive plan, which involved a pre-treatment protocol of three administrations of prednisone (a form of steroid), he would have followed that order. If the Interventional Cardiologist had seen Aragon at 8 a.m., he would have pre-treated him with a dose of steroids at that time and followed up with a second dose at 4 p.m.
In order to prove causation, the Estate presented the testimonies of Dr. Carl Bakken, an internal medicine expert, and Dr. William Alton, a cardiology expert. According to Dr. Bakken, the Internist deviated from the standard of care by first, failing to see Aragon within six hours of his admission to the hospital. Because the Internist did not see or inquire about Ara-gon until after sixteen hours of Aragon’s admission, the Internist missed the opportunity to find out the elevated cardiac-enzyme test results on the night of November 7, which should have triggered a call for a cardiac consultation at that time.
Second, the delay in seeing Aragon caused a late discovery of Aragon’s shellfish allergy. As a result, the Internist did not initiate a pre-treatment plan or directly advise a consulting cardiologist of Ara-gon’s myocardial injury and his shellfish allergy.
Third, because the Internist failed to find out the result of the third cardiac-enzyme test when he finally examined Ara-gon in the morning of November 8, he did not know the enzymes level had decreased, which meant that there was decreasing injury to the heart muscle. The importance of the decreased level of troponin enzymes was that even though Aragon still needed the catheterization procedure, his condition was no longer life-threatening, and the procedure was not needed on an emergency basis. It could be delayed long enough to perform a pre-treatment protocol of three administrations of prednisone.
Fourth, after seeing Aragon in person and examining his medical record, the Internist failed to convey to the Initial Cardiologist a complete picture of Aragon’s condition, which was quite different from the information the Internist had given the Initial Cardiologist on the phone. Aragon had not had chest pain since the afternoon of the day before, he had the shellfish allergy listed in his medical history, and his level of cardiac enzymes had decreased.
Dr. Bakken testified that had the Internist not deviated from the standard of care, the full steroid pre-treatment would have occurred, and more likely than not, Aragon would not have sustained an ana-phylactic reaction from the contrast dye.
Dr. Alton testified that pertinent and updated information possessed by the Internist, which would have facilitated a car *892 diologist’s assessment of the risks and benefits of a particular diagnostic plan, was never communicated to the Interventional Cardiologist.
Dr. Alton testified that the allergic reaction could have been avoided if Aragon had been given the standard pre-medication protocol — by taking prednisone thirteen hours, seven hours, and one hour before the procedure. Dr. Alton opined that Ara-gon would absolutely still be alive if he had been given the thirteen-hour pre-treatment plan.
After the trial, the jury found the Internist, the hospital, and the Interventional Cardiologist negligent,[1] and their negligence was a legal cause of the death of Aragon. The Initial Cardiologist was found not liable for Aragon’s death. The jury apportioned ten percent of the fault to the Internist, fifteen percent to the hospital, seventy-five percent to the Interven-tional Cardiologist, and awarded damages to the Estate.
The Internist filed a post-trial motion for directed verdict or in the alternative, a new trial. The Internist argued that Ara-gon’s death was caused exclusively by the Interventional Cardiologist’s errors, the Estate had failed to present competent evidence that the Internist’s negligence was a legal cause of the death of Aragon, and the expert testimony offered on causation was speculative. The trial judge entered a final judgment against the Estate based upon the motion for judgment in accordance with the motion for directed verdict. The trial judge did not reach a decision regarding the motion for new trial. The Estate appeals.
ANALYSIS
“To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant’s breach of the standard of care, and that said breach proximately caused the damages claimed.” Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1018 (Fla.1984).
Regarding causation in negligence cases, “Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiffs injury.” Id. The burden of proof is placed on the plaintiff. Id.
Medical experts are subject to the rule that their opinion cannot be based on pure speculation. Cox, 71 So.3d at 799-800. A directed verdict is improper when a plaintiff presented evidence that “could support a finding that the defendant more likely than not caused the injury.” Id. at 801. When conflicting evidence has been presented regarding causation or the probability of causation, it is inappropriate for a trial judge to resolve it as a matter of law. Id. The matter is reserved to the jury. Id.
The Estate argues that the jury could have found that the Internist’s breach of care led to the failure to devise a pretreatment plan and caused a false sense of urgency when the Interventional Cardiologist finally learned of the shellfish allergy in the catheterization lab. The jury could have also believed the Interventional Cardiologist’s testimony that if he knew he had the luxury of time, he would have used a more rigorous pre-treatment plan that other expert witnesses opined would have saved Aragon’s life.
The Internist argues that the directed verdict must be allowed to stand because *893 the Estate failed to prove the Internist’s breach caused or contributed to the Inter-ventional Cardiologist’s mistake not to pre-treat Aragon appropriately. To support that argument, the Internist points to the Interventional Cardiologist’s statements that it was speculation that he would pre-treat Aragon with another dose of predni-sone had he seen Aragon at 8 a.m. on November 8, and that the Interventional Cardiologist believed that the single dose of steroids was adequate treatment for Aragon.
The Interventional Cardiologist did state on more than one occasion that there were no guidelines or trial studies proving that the thirteen-hour pre-treatment protocol is better than the one-dose protocol. The Interventional Cardiologist, however, also testified that first, if he knew he had the luxury of time, he would have used the pre-treatment plan with three administrations of steroids, second, if a more comprehensive plan for pre-treatment had been instituted by a consulting cardiologist, he would have followed it, and third, had he seen Aragon at 8 a.m. on November 8, he would have given Aragon an early steroid dose at that time, which according to Dr. Alton, would be more protective than just the one closer to the time of the cardiac catheterization.
There was also evidence that the Inter-ventional Cardiologist’s decision was affected by the incomplete information the Internist communicated to him via the Initial Cardiologist. The Interventional Cardiologist was under the impression that Aragon was having intermittent chest pain and that, combined with the positive cardiac-enzyme test results, qualified him as an unstable patient.
Due to the posture of this case, the Internist, as the moving party, may not cherry-pick the testimony that is most favorable to his defense.
Because there is evidence that a jury could rely upon in finding that the Internist’s failure to communicate vital information and coordinate Aragon’s care caused the Interventional Cardiologist to rush to perform the cardiac catheterization, a directed verdict is therefore improper. See Hancock, 941 So.2d at 412.
The Internist urges this Court to apply the reasoning of Ewing v. Sellinger, 758 So.2d 1196, 1197 (Fla. 4th DCA 2000). In Ewing, the expert witness testified that if the initial physician had conducted a proper risk assessment, he would have ordered a physician to be present for Ewing’s delivery. Had that occurred, the attending physician would have noticed the fetal distress and performed a c-section, which would have avoided the injuries to the infant and the mother during the difficult delivery. Id. at 1198.
However, the attending physician testified that had he reviewed the fetal monitor strips at any point during the delivery, he would not have performed a c-section. Id. This Court concluded that because what the initial physician failed to do would not have any impact on the outcome of the case, Ewing failed to prove that the initial physician’s negligence was the proximate cause of Ewing’s injuries, a post-trial directed verdict against Ewing was therefore proper. Id. at 1197-98.
Ewing is inapplicable here because the Interventional Cardiologist was not consistent in his testimony regarding whether he would have administered the thirteen-hour pre-treatment protocol had he been informed of Aragon’s shellfish allergy at an earlier time, or whether he would have given Aragon another dose of steroids had he seen Aragon at 8 a.m. on November 8. When conflicting evidence was presented regarding causation and likelihood of causation, the matter should not be resolved *894 by a trial judge as a matter of law. Cox, 71 So.3d at 801. The issue is reserved to the jury. Id.
The Internist next argues that Dr. Bakken’s testimony on causation was based úpon speculation and conjecture. We disagree. The cases the Internist relied upon to support the Internist’s argument that Dr. Bakken’s conclusion was speculative are distinguishable. See Hollywood Med. Ctr. v. Alfred, 82 So.3d 122, 126 (Fla. 4th DCA 2012) (finding no testimony was provided regarding how the nurses’ failure to act would have affected the patient’s outcome); Jackson Cnty. Hosp. Corp. v. Aldrich, 835 So.2d 318, 324 (Fla. 1st DCA 2002) (expert witness admitted that his survival-rate prediction was based upon people actually treated in major-burn institutions, unlike the decedent who had not been treated in a major-burn institution); Elder v. Farulla, 768 So.2d 1152, 1154 (Fla. 2d DCA 2000) (causation not established when expert witness could not testify with certainty regarding the cause of plaintiffs condition); Carnival Corp. v. Stowers, 834 So.2d 386, 387 (Fla. 3d DCA 2003) (expert witness’s opinion regarding the carpet’s ability to absorb or wick liquid had no factual basis when he did not know either the composition or the absorbing properties of the carpet).
The expert testimony presented here was analogous to the expert testimony approved by Hancock and Cox. The manner in which Dr. Bakken drew his inference and conclusion was similar to the approach taken by the expert witness in Hancock. In that case, after a jury returned a verdict in favor of the plaintiff, the trial judge entered an order granting the motion for judgment in accordance with the motion for directed verdict in favor of the defendant. Hancock, 941 So.2d at 412. The trial judge found that the plaintiff failed to prove causation because the expert witness’s conclusion was based upon “at least an inference on an inference on an inference.” Id.
In Hancock, it was undisputed that Hancock’s death was caused by cardiac arrhythmia. Hancock, 941 So.2d at 413. The expert witness testified that had Hancock been admitted to the hospital, the sudden cardiac arrhythmia would not have occurred, and Hancock would have had at least a survival rate of sixty percent because “tests would have been conducted, and problems could have been taken care of, whether [the problem was] a potassium deficiency or a low oxygen level.” Id.
Although the expert witness’s opinion was not based on any actual lab results, this Court agreed with the inferences drawn by the plaintiff. See id.
This Court found that a prima facie case on the issue of causation had been established by Hancock, and the issue was properly submitted to the jury. Id. This Court reversed the trial court’s order and directed the trial judge to reinstate the jury verdict in favor of the plaintiff. Id.
In Cox, the Florida Supreme Court reversed the second district’s ruling that the expert witness’s testimony was pure speculation even though she testified that the plaintiffs injury was probably the result of the defendant’s negligence. Cox, 71 So.3d at 800. The Florida Supreme Court reasoned that the expert witness did not base her opinion on speculation when she provided a detailed analysis relying upon “her experience, the relevant medical literature, and her knowledge about the facts and records involved in [that] case.” Id. at 801.
The Supreme Court found that the second district impermissibly reweighed the evidence by rejecting the portion of the expert witness’s testimony that contradicted the defense’s characterization of the *895 NINDS study, which the expert witness had relied upon to prove causation. Id. at 800-01. The Supreme Court reasoned that when a plaintiff “failed to provide evidence that the negligent act more likely than not caused the injury,” a directed verdict is proper. Id. at 801. However, when conflicting evidence was presented regarding the “causation or the likelihood of causation,” the issue should be resolved by a jury, rather than by an appellate court as a matter of law. Id[2]
Here, it was undisputed that Ara-gon died of an adverse anaphylactic reaction. Both Dr. Bakken and Dr. Alton testified that had Aragon been given a pretreatment plan, more likely than not, Ara-gon would still be alive. Dr. Bakken explained how the Internist’s deviation from the standard of care caused Aragon’s death. Had the Internist seen Aragon on the evening of November 7, he would have discovered that Aragon had sustained a myocardial infarction, and Aragon had a history of shellfish allergy. A cardiology consult would have been obtained, and a pre-treatment plan could have been implemented. Therefore, as was the situation with the plaintiff in Hancock, the Estate established a prima facie case on the issue of causation. As was the case for the trial judge in Cox, the trial judge should not have reweighed the Interventional Cardiologist’s conflicting testimony, which was properly submitted to the jury for their evaluation and decision. The trial court erred in disturbing the result of an issue that was properly submitted to and resolved by the jury.
For the reasons stated above, we reverse the trial judge’s granting of the motion for judgment in accordance with the motion for directed verdict in favor of the Internist. On remand, the trial court shall rule on the motion for a new trial. If the court denies the motion, it shall enter judgment for the estate consistent with the jury’s verdict.
POLEN, CONNER, JJ., and McMANUS, F. SHIELDS, Associate Judge, concur.

. The Interventional Cardiologist and the hospital were listed on the verdict form as Fabre defendants. See Fabre v. Marin, 623 So.2d 1182 (Fla. 1993).

. See also Saunders v. Dickens, 103 So.3d 871, at 877-78 (Fla. 4th DCA 2012), in which this court affirmed when “the trial court declined to grant the defendant’s motion for directed verdict, and, instead, submitted the case to the jury, thus allowing the plaintiffs to argue to the jury in closing why they should reject [the prior treaters'] causation argument.”