NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

RAYMOND C. SANTA LUCIA, Ph.D.,          )
                                        )
          Appellant/Cross-Appellee,     )
                                        )
v.                                      )          Case No. 2D14-5011
                                        )
STEVEN M. LeVINE, M.D. and LeVINE       )
SURGICAL ASSOCIATES, P.A.,              )
                                        )
          Appellees/Cross-Appellants,   )
                                        )
and                                     )
                                        )
BENNETT W. SMITH, M.D.; FERNANDO        )
R. DIAZ, M.D.; and FLORIDA GULF-TO-     )
BAY ANESTHESIOLOGISTS                   )
ASSOCIATES, P.A.,                       )
                                        )
          Appellees.                    )
_____)

Opinion filed March 9, 2016.

Appeal from the Circuit Court for Pinellas
County; Amy M. Williams, Judge.

Melissa H. Powers of Maher Law Firm,
P.A., Winter Park; William E. Hahn of
William E. Hahn, P.A., Tampa; and Philip
M. Burlington of Burlington & Rockenbach,
P.A., West Palm Beach, for
Appellant/Cross-Appellee.

Karen Cox and Troy J. Crotts of Bush Ross,
P.A., Tampa, for Appellees/Cross-

Appellants Steven M. LeVine, M.D. and
LeVine Surgical Associates, P.A.

Pamela Jo Bondi, Attorney General, Allen
Winsor, Solicitor General, and Osvaldo
Vasquez, Deputy Solicitor General,
Tallahassee, for Amicus Curiae the State.

No appearance for remaining Appellees.

BLACK, Judge.

In this appeal from a medical malpractice judgment, Dr. Raymond Santa Lucia, the plaintiff below, challenges the judgment entered in his favor. He contends that section 766.118, Florida Statutes (2012), is unconstitutional and that the trial court erred in applying the statute and reducing the noneconomic damages awarded by the jury. Dr. Steven M. LeVine and LeVine Surgical Associates, P.A., cross-appeal, arguing that the trial court erred in denying their motion for directed verdict.[1] Our resolution of Dr. LeVine's cross-appeal, requiring reversal of the final judgment against Dr. LeVine and remand for entry of a directed verdict, is determinative. As a result, we do not reach the constitutional issue raised by Dr. Santa Lucia.[2]

I.      Background

---

[1]For ease of reference, unless necessary to avoid confusion, we will refer to Dr. LeVine and LeVine Surgical Associates as Dr. LeVine throughout the opinion.

[2]Under the principle of judicial restraint, "courts should avoid considering a constitutional question when a case may be disposed of on nonconstitutional grounds." Anderson v. City of St. Pete Beach, 161 So. 3d 548, 550 n.1 (Fla. 2d DCA 2014).

Dr. Santa Lucia[3] brought his medical malpractice action against Dr. LeVine and LeVine Surgical Associates, among others.[4] He proceeded under two theories which are intertwined under the facts of this case. First, Dr. Santa Lucia claimed that Dr. LeVine's failure to obtain his informed consent to the surgery resulted in the patient's injuries. Second, he claimed that Dr. LeVine's failure to obtain a preoperative consultation with a physician with knowledge of Dr. Santa Lucia's underlying neuromuscular disorder was the proximate cause of his injuries. Although Dr. Santa Lucia established the standard of care for each theory, his failure to satisfy the breach element of the first theory and the causation element of both theories required a directed verdict in favor of Dr. LeVine.

At trial, the experts all agreed that the surgery was medically appropriate and completed without incident. However, Dr. Santa Lucia suffered postoperative difficulties while in the post-anesthesia recovery area. He failed extubation—his heart rate slowed to critical levels and his blood oxygenation dropped. Dr. Santa Lucia was reintubated and returned to mechanical ventilation as a result. During his hospitalization Dr. Santa Lucia "coded" several times. He alleged that he suffered permanent injuries and can no longer live independently.

The jury found Dr. LeVine ninety percent responsible for Dr. Santa Lucia's injuries. It awarded no economic damages and $1,200,000 in noneconomic damages.

---

[3]At the time of trial, Dr. Santa Lucia had obtained a Ph.D. in clinical psychology. Although potentially confusing, out of deference, we refer to Dr. Santa Lucia by his title.

[4]The order on appeal is "The Final Judgment as to Steven M. LeVine, M.D. and LeVine Surgical Associates, P.A." The other defendants below have not made appearances in this appeal and our decision does not affect them.

Dr. LeVine moved to limit the noneconomic damages pursuant to section 766.118, and the trial court granted the motion. The court then entered a final judgment in favor of Dr. Santa Lucia and against Dr. LeVine in the amount of $450,000.

II.      Testimony

Dr. LeVine is a board-certified general surgeon who first saw Dr. Santa Lucia when the patient was hospitalized for potential diverticulitis with abscess in January 2005. Dr. LeVine provided a surgical consultation wherein he reviewed Dr. Santa Lucia's hospital chart and the test data available, performed a physical examination, and discussed Dr. Santa Lucia's medical history with him. As is the generally accepted practice, Dr. LeVine recommended surgery to remove the abscessed area. Dr. Santa Lucia's gastroenterologist also recommended surgery.

During Dr. LeVine's first consultation with the patient, he was made aware that Dr. Santa Lucia was born with a rare neuromuscular disorder—myotubular myopathy. Dr. LeVine had never treated a patient with myotubular myopathy at the time he began treating Dr. Santa Lucia, and he was unfamiliar with the specific disorder. However, he had a general understanding of myopathies. Dr. LeVine noted that Dr. Santa Lucia had difficulty lying down and moving from a sitting position to a standing position and he exhibited some muscle weakness. He also noted that Dr. Santa Lucia used his abdominal wall muscles to speak because of the myotubular myopathy, that he would occasionally become short of breath and was a smoker, and that he had previously been advised he had "very poor lung capacity." Dr. LeVine did not consult with any physician regarding Dr. Santa Lucia's underlying neuromuscular disorder prior to surgery.

All of Dr. Santa Lucia's preoperative tests indicated surgery could proceed. Dr. LeVine testified that he discussed the risks of surgery with Dr. Santa Lucia; the discussion was documented in the patient records. Dr. LeVine discussed "the risks of anesthesia, bleeding, and infection," and he testified that he "probably mentioned that the risk of infection was somewhat increased in [Dr. Santa Lucia's] case because of his previous history" and the surgical site. He did not discuss with Dr. Santa Lucia any risks of surgery specific to myotubular myopathy. As a general surgeon and not an anesthesiologist, Dr. LeVine was unaware of what anesthetic risks might be associated with myotubular myopathy. He testified that he expected the anesthesiologist to examine Dr. Santa Lucia and interview him prior to surgery regarding his anesthetic care.

Dr. Bennett Smith testified that he was the anesthesiologist who evaluated Dr. Santa Lucia prior to surgery. Through his preoperative review of Dr. Santa Lucia's records and his preoperative consultation with the patient, Dr. Smith became aware that Dr. Santa Lucia had myotubular myopathy, poor lung capacity, and diffuse muscle weakness. Dr. Smith advised Dr. Santa Lucia that given his neuromuscular condition he was at high risk for requiring postoperative mechanical ventilation and that the breathing tube inserted for surgery would remain in place until such time as Dr. Santa Lucia was able to breathe without assistance and it was safe to extubate. With that in mind, Dr. Smith advised Dr. Santa Lucia that he might remain intubated for a period of hours or days following surgery.

Dr. Fernando Diaz was the treating anesthesiologist. His testimony established, in relevant part, that Dr. Santa Lucia was given general anesthetic, intubated, and placed on mechanical ventilation for surgery.

Although unfamiliar with myotubular myopathy, Dr. Michael Hellinger testified as the surgical standard of care expert for Dr. Santa Lucia and was the only expert retained specifically for Dr. Santa Lucia's case against Dr. LeVine. Dr. Hellinger is board certified in both general and colorectal surgery. He reviewed the patient's medical records and various depositions of the physicians involved in the patient's surgery and his postsurgical care. Dr. Hellinger opined that the appropriate standard of care for a general surgeon planning on performing surgery on a patient "who has a potential surgical disease process" such as myotubular myopathy would be to consult with physicians familiar with that patient's underlying illness and learn how the disease process might affect the surgical procedure, including the anesthesia and recovery components. Dr. Hellinger opined that without knowledge of the underlying illness the surgeon cannot provide an educated opinion as to the patient's surgical risks, enabling the patient to give informed consent. He believed that a preoperative consultation would be appropriate with a neurologist, pulmonary specialist, or primary care physician. Significantly, Dr. Hellinger did not testify as to what the consultation would have revealed that would be relevant to Dr. Santa Lucia's consent to the surgery. Nor did he opine that Dr. LeVine, a general surgeon and not an anesthesiologist, was required to explain the risks associated with general anesthesia and intubation in order to meet the standard of care or that anything Dr. LeVine should have told Dr. Santa Lucia would have resulted in cancellation or delay of the surgery.

Dr. Adam DiDio is a board-certified neurologist with a subspecialty in neuromuscular diseases. Dr. DiDio did not review the records from Dr. Santa Lucia's surgery and did not begin treating him until 2007, after the surgery at issue. He testified that he has only treated two people with myotubular myopathy, Dr. Santa Lucia and a prior patient. The first patient was seen only once. Dr. DiDio testified that if patients with neuromuscular conditions have questions about surgery he tells them that they are at increased risk of pulmonary complications "if they go under general anesthesia and need to be intubated." His response to physicians' surgical concerns is the same. Dr. DiDio also testified that in all instances where he had advised patients or surgeons of the risk, the patients elected to proceed with surgery.

Dr. Santa Lucia did not present testimony from a pulmonary specialist. However, other physicians, including a physical medicine and rehabilitation physician and a primary care physician, testified. None of these physicians testified that Dr. LeVine was required to discuss anesthesia-related risks with Dr. Santa Lucia. Nor did they testify as to any additional risks for a patient with myotubular myopathy undergoing surgery. Thus, their testimonies are not relevant to the issue raised in Dr. LeVine's cross-appeal.

Dr. Santa Lucia testified that he would not have undergone surgery had he been advised of the risks which he now understands are associated with the surgery. This is the entirety of Dr. Santa Lucia's evidence of causation.

III.    Motion for Directed Verdict

Dr. LeVine moved for directed verdict, arguing that Dr. Santa Lucia failed to establish causation as to both the failure to obtain informed consent and the failure to

obtain a preoperative consultation.  He contended that while Dr. Hellinger testified as to the standard of care, he did not testify as to what information would have been provided in a consultation which should then have been conveyed to Dr. Santa Lucia.[5]  Nor did he opine how that unknown information might have impacted Dr. Santa Lucia's consent to surgery.  Dr. LeVine pointed out that of the physicians identified by Dr. Hellinger as appropriate consultants to meet the standard of care, only a neurologist testified regarding the risks posed to patients with neuromuscular disorders.  While Dr. DiDio testified that patients with neuromuscular conditions are at greater risk for anesthesia-related complications, he did not testify to surgery-specific complications.  And the anesthesia-related information was conveyed to Dr. Santa Lucia prior to his surgery by Dr. Smith, who was aware of the patient's neuromuscular disorder.  Therefore, the only risk identified by Dr. Santa Lucia's expert witnesses was the one addressed by the anesthesiologist, Dr. Smith.  Dr. Santa Lucia offered no other expert testimony as to the specific, material risks involved in surgery on a patient with myotubular myopathy.  Dr. LeVine renewed his motion for directed verdict after the jury returned its verdict.  In both instances the motion was denied.

IV.    Analysis

We review the denial of a motion for directed verdict de novo.  Shartz v. Miulli, 127 So. 3d 613, 618 (Fla. 2d DCA 2013).  "To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the

---

[5]Because Dr. Hellinger is not a neurologist, pulmonary specialist, or primary care physician with experience with neuromuscular disorders or myotubular myopathy, he was not qualified to testify as to what specific information would have been provided to Dr. LeVine in a preoperative consultation.

defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." Id. (quoting Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984)).  To establish proximate cause, "the plaintiff must show that what was done or failed to be done probably would have affected the outcome." Gooding, 445 So. 2d at 1020.  And the plaintiff must do so "without an impermissible stacking of inferences." Shartz, 127 So. 3d at 618.  A directed verdict is proper where the plaintiff fails to present evidence that "could support a finding that the defendant more likely than not caused the injury." Aragon v. Issa, 103 So. 3d 887, 892 (Fla. 4th DCA 2012) (quoting Cox v. St. Josephs Hosp., 71 So. 3d 795, 801 (Fla. 2011)).

A.    Informed Consent

"Under the doctrine of informed consent, a physician has an obligation to advise his or her patient of the material risks of undergoing a medical procedure." State v. Presidential Women's Ctr., 937 So. 2d 114, 116 (Fla. 2006) (citing Thomas v. Berrios, 348 So. 2d 905, 907 (Fla. 2d DCA 1977)).  "The duty of the physician to inform and the extent of the information which may be required varies in each case depending upon the particular circumstances." Thomas, 348 So. 2d at 907.  Thus, "expert testimony is required in informed consent cases to establish whether a reasonable medical practitioner in the community would make the pertinent disclosures under the same or similar circumstances." Id. (citing Ditlow v. Kaplan, 181 So. 2d 226 (Fla. 3d DCA 1966)); accord Ritz v. Fla. Patient's Comp. Fund, 436 So. 2d 987, 991 (Fla. 4th DCA 1983).

Thomas established not only that the standard of care must be provided via expert testimony but that there must be expert testimony as to the "pertinent disclosures"—the specific, material risks to the patient.  "A plaintiff is required to establish through expert testimony the information which should have been conveyed to her under the circumstances."  Copenhaver v. Miller, 537 So. 2d 198, 200 (Fla. 2d DCA 1989) (citing Pub. Health Trust of Dade Cty. v. Valcin, 507 So. 2d 596, 598 (Fla. 1987)).  "Only practitioners with knowledge about the medical subject involved are competent to prescribe what information must be imparted."  Gouveia v. Phillips, 823 So. 2d 215, 228 (Fla. 4th DCA 2002).  Where the plaintiff's claim is that a physician's disclosure of risks was "inaccurate or inadequate, the trier of fact will have to know what would be accurate or adequate according to that physician's 'community' or specialty."  Id.; see Ritz, 436 So. 2d at 990 ("In order to submit to a jury the issue of whether and to what extent specific risks of surgery should be disclosed to a patient in securing the patient's informed consent to the procedure, evidence is required as to the nature and extent of the risks . . . ." (emphasis added)).  The plaintiff cannot meet this burden of proof by relying on speculation.  Cox, 71 So. 3d at 799.

Dr. Hellinger was Dr. Santa Lucia's standard of care expert.  As a general surgeon, he was qualified to provide the standard applicable to Dr. LeVine.  See Thomas, 348 So. 2d at 907; Ritz, 436 So. 2d at 991.  However, because Dr. Hellinger was unfamiliar with myotubular myopathy, he did not and could not provide testimony as to what an accurate and adequate disclosure to Dr. Santa Lucia would have been.  Cf. Gouveia, 823 So. 2d at 228.  Nor did he opine that Dr. LeVine had a duty to advise Dr. Santa Lucia about risks specific to anesthesia.  See Hollywood Med. Ctr., Inc. v. Alfred,

82 So. 3d 122, 125 (Fla. 4th DCA 2012). Dr. Hellinger did not establish the standard of care for a general surgeon to obtain informed consent independent of his testimony that a preoperative consultation was required to learn the otherwise unknown risks a patient with myotubular myopathy might encounter during surgery. Thus, on the facts of this case, the standard of care for obtaining informed consent and for obtaining a preoperative consultation are inextricable.

The analysis set forth in Ditlow is instructive:

> It should be noted at this juncture that the plaintiff is not claiming on this appeal that the defendant was guilty of any negligence in the manner in which the gastroscopy was performed. Nor is there any dispute as to the fact that the plaintiff consented to the gastroscopy, and that she was informed that there were certain risks. The only question is whether, under the doctrine of informed consent, it was necessary to advise her as to the specific risks which might be encountered.
>
> . . . .
>
> Our prior decisions indicate that the physician must adequately inform the patient about the dangers to be anticipated as a result of an operation, and that evidence of the standard prevailing in the community is necessary in order to demonstrate an issue as to the breach of this duty. See Bowers v. Talmage, Fla. App. 1963, 159 So. 2d 888 [(Fla. 3d DCA 1963)]; Visingardi v. Tirone, Fla. App. 1965, 178 So. 2d 135 [(Fla. 3d DCA 1965)].
>
> The plaintiff offered no evidence that it was the accepted practice in the community, among gastroenterologists and physicians of the defendant's standing, to advise the patient of the specific risk of perforation. We are therefore of the opinion that this case must be affirmed upon the authority of [Visingardi] and decisions cited therein.

181 So. 2d at 228 (emphasis added). As in Ditlow, Dr. Santa Lucia presented no expert testimony as to the alleged breach by Dr. LeVine. "The opinion of an expert is not

sufficient to eliminate the necessity of proving the foundation facts necessary to support the opinion." Shartz, 127 So. 3d at 620 (quoting Harris v. Josephs of Greater Miami, Inc., 122 So. 2d 561, 562 (Fla. 1960)).  Simply because Dr. Hellinger opined that a physician with knowledge of myotubular myopathy would have given additional information to Dr. LeVine does not make it so.  "Medical experts are subject to the rule that their opinion cannot be based on pure speculation." Aragon, 103 So. 3d at 892 (citing Cox, 71 So. 3d at 799-800).

There was no testimony as to the specific risks to which Dr. Santa Lucia should have been advised.  At best, Dr. DiDio testified that patients with similar disorders to Dr. Santa Lucia's should be advised they are at greater risk of pulmonary complications; he did not testify as to what those complications might be or testify as to the extent of those risks.  "Without such evidence the jury can only speculate on the existence and extent of possible risks, on alternative methods of treatment and on possible complications." Ritz, 436 So. 2d at 992-93.  Dr. Santa Lucia's case rested on the theory that his consent to surgery was not informed based on some unidentified inadequacy in the information provided by Dr. LeVine.  Dr. Santa Lucia failed to establish a breach of the standard of care. Cf. Chua v. Hilbert, 846 So. 2d 1179, 1182-83 (Fla. 4th DCA 2003) (discussing identification of the specific risk relevant to the informed consent issue).

However, even if Dr. DiDio's testimony, coupled with Dr. LeVine's testimony regarding the disclosures he made to Dr. Santa Lucia, was sufficient to establish the standard of care and breach thereof, Dr. Santa Lucia presented no evidence of causation.  Dr. Santa Lucia did not establish that Dr. LeVine's failure to

- 12 -

advise him that he was at greater risk of pulmonary complications than a patient without myotubular myopathy probably affected either Dr. Santa Lucia's consent to the surgery or the injuries suffered postsurgery. Dr. Santa Lucia was advised of the risk of pulmonary complications by an anesthesiologist, Dr. Smith, and he elected to proceed with surgery. "It is not sufficient to say, with the 20/20 vision of hindsight, that had the consenting person known that a result which does occur could have occurred, no consent would have been given." Ritz, 436 So. 2d at 993. It is not enough for the plaintiff to testify that he would not have consented had a specific, material disclosure been made; he must present evidence "that a reasonably prudent person would not have consented to the procedure had the material risks been disclosed." Id.; see § 766.103(3)(a)(2), (3)(b) (identifying "reasonable individual" and reasonable patient as the standard for informed consent issues); Cox, 71 So. 3d at 799 (stating that speculation is insufficient to satisfy the burden of proof). Here, at a minimum Dr. Santa Lucia was required to present evidence that a reasonably prudent patient with an underlying neuromuscular disease would not have consented to surgery had he been advised that he was at "increased risk of pulmonary complications." Cf. Presidential Women's Ctr., 937 So. 2d at 119 (discussing the reasonable patient standard of section 390.0111, Florida Statutes (2005), and approving the interpretation that "the doctor need only consider, address, and inform based on that patient's individualized circumstances in determining what information is material and to be provided as the 'informed consent' "); Ritz, 436 So. 2d at 990-91 (discussing informed consent where parents "had a lifetime of experience" with their daughter's problems and "were curious and knowledgeable about her treatment"). No expert testified that in his experience an

informed patient elected not to proceed with surgery.  Quite the opposite, Dr. DiDio testified that patients with neuromuscular diseases whom he had advised of the increased risk for pulmonary complications proceeded with surgery.  Moreover, Dr. LeVine's expert testified that the risks of not having surgery were great, including the potential for a rupture resulting in Dr. Santa Lucia's death.  Dr. Smith advised Dr. Santa Lucia prior to surgery that he was at high risk to require mechanical ventilation postsurgery; Dr. Smith gave the one warning that expert testimony indicated should have been given.  And Dr. Santa Lucia proceeded with surgery.  However, we need not address whether Dr. Smith's disclosure can or should be imputed to Dr. LeVine because Dr. Santa Lucia's case fails independent of this question.

B.      Preoperative Consultation

As discussed above, Dr. Hellinger established the standard of care by testifying that a general surgeon unfamiliar with myotubular myopathy had a duty to consult with physicians who were familiar with the disorder in order to ascertain the surgical risks for the patient and to obtain an informed consent for the surgery.  He opined that such a preoperative consultation should have been with a neurologist, pulmonary specialist, or primary care physician.  On this theory, Dr. Santa Lucia established both the standard of care and a breach because Dr. LeVine agreed he did not seek a preoperative consultation on Dr. Santa Lucia's case.  However, Dr. Santa Lucia again failed to establish causation.

None of Dr. Santa Lucia's experts testified to a causal link between the failure to consult with a physician familiar with myotubular myopathy and the injuries the patient suffered.  Cf. Cox, 71 So. 3d at 801 (discussing causation testimony); Aragon,

- 14 -

103 So. 3d at 895 (same).  Dr. DiDio's testimony regarding pulmonary complications was nonspecific.  He did not testify that had he spoken with Dr. LeVine the surgery would not have proceeded; he did not testify that had he spoken with Dr. LeVine consent to surgery would not have been given; and he did not testify that the injuries suffered by Dr. Santa Lucia would not have occurred had Dr. LeVine spoken with him. Cf. Shartz, 127 So. 3d at 620 (discussing the lack of causation evidence and testimony). There was no dispute that the injuries suffered by Dr. Santa Lucia were postsurgery and anesthesia-related.  There was simply no evidence that the injuries Dr. Santa Lucia sustained probably would not have occurred had Dr. LeVine—a general surgeon and not an anesthesiologist—obtained a preoperative consultation.

IV.    Conclusion

"A mere possibility of . . . causation is not enough; and when the matter remains one of pure speculation or conjecture . . . it becomes the duty of the court to direct a verdict for the defendant."  Gooding, 445 So. 2d at 1018.  Because the patient, Dr. Santa Lucia, did not sustain his burden under either theory of negligence against Dr. LeVine, the trial court should have directed a verdict in Dr. LeVine's favor.  We reverse the final judgment against Dr. LeVine and LeVine Surgical Associates and remand for entry of a directed verdict in their favor.

Reversed and remanded with instructions.


ALTENBERND and CRENSHAW, JJ., Concur.